**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: May 11, 2016      Decided:  October 25, 2016)

Docket Nos. 14-4369-cv(L), 14-4509-cv(XAP)

_____

EMI CHRISTIAN MUSIC GROUP, INCORPORATED, PRIORITY
RECORDS LLC, BEECHWOOD MUSIC CORPORATION, COLGEMS-EMI
MUSIC, INCORPORATED, EMI APRIL MUSIC, INC., EMI BLACKWOOD
MUSIC, INC., EMI FULL KEEL MUSIC, INC., EMI GOLDEN TORCH
MUSIC CORPORATION, EMI LONGITUDE MUSIC, EMI VIRGIN
MUSIC, INC., EMI VIRGIN SONGS, INC., CAPITOL RECORDS, LLC,

*Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants*,

EMI AL GALLICO MUSIC CORPORATION, EMI ALGEE MUSIC
CORPORATION, EMI FEIST CATALOG, INC., EMI GOLD HORIZON
MUSIC CORP., EMI GROVE PARK MUSIC, INCORPORATED, EMI
HASTINGS CATALOG, INCORPORATED, EMI MILLS MUSIC,
INCORPORATED, EMI MILLER CATALOG, INCORPORATED, EMI
ROBBINS CATALOG, INCORPORATED, EMI U CATALOG, INC., EMI
UNART CATALOG INC., JOBETE MUSIC COMPANY,
INCORPORATED, SCREEN GEMS-EMI MUSIC, INCORPORATED,
STONE AGATE MUSIC, STONE DIAMOND MUSIC
CORPORATION,

*Plaintiffs-Appellees-Cross-Appellants*,

v.

MP3TUNES, LLC,

*Defendant-Counter-Claimant-Cross-Appellee*,

14-4369(L)
EMI Christian Music Grp., Inc. et al. v. MP3tunes, LLC et al.

MICHAEL ROBERTSON,

*Defendant-Appellant-Cross-Appellee*.*

_____

Before:

CABRANES, STRAUB, and LOHIER, *Circuit Judges.*

In this appeal, we principally address one requirement of the Digital Millennium Copyright Act ("DMCA") safe harbor: that an internet service provider "adopt[] and reasonably implement[]" a policy to terminate "repeat infringers." 17 U.S.C. § 512. The plaintiffs, all record companies and music publishers, brought this copyright infringement suit against MP3tunes, LLC and its founder and Chief Executive Officer Michael Robertson. The plaintiffs alleged that two websites created by MP3tunes—MP3tunes.com, which primarily served as a locker service for storing digital music, and sideload.com, which allowed users to search for free music on the internet—infringed their copyrights in thousands of sound recordings and musical compositions. After the parties filed cross-motions for summary judgment, the United States District Court for the Southern District of New York (Pauley, J.) determined, among other things, that MP3tunes had a reasonably implemented repeat infringer policy. A jury ultimately returned a verdict in favor of the plaintiffs that was partially overturned by the District Court. We **AFFIRM** in part, **VACATE** in part, **REVERSE** in part, and **REMAND** for further proceedings.

ANDREW H. BART (Frank P. Scibilia, M. Mona Simonian, Ross M. Bagley, Pryor Cashman LLP, New York, NY, Luke C. Platzer, J. Douglas Wilson, Jenner & Block LLP, Washington, DC, *on the brief*), Jenner & Block LLP, New York, NY, *for Plaintiffs-Appellees-Cross-Appellants.*

_____

\* The Clerk of Court is directed to amend the official caption to conform with the above.

14-4369(L)
EMI Christian Music Grp., Inc. et al. v. MP3tunes, LLC et al.

IRA S. SACKS (Mark S. Lafayette, Jamie B. Shyman, Patricia M. Carlson, *on the brief*), Akerman LLP, New York, NY, *for Defendant-Appellant-Cross-Appellee.*

LOHIER, *Circuit Judge*:

In this appeal we principally consider the requirement of the Digital Millennium Copyright Act ("DMCA") safe harbor that an internet service provider "adopt[] and reasonably implement[]" a policy to terminate "repeat infringers."  17 U.S.C. § 512.  Plaintiffs-appellees-cross-appellants are all record companies and music publishers.  They filed this copyright infringement lawsuit against MP3tunes, LLC and its founder and Chief Executive Officer Michael Robertson,[1] alleging that two internet music services created by MP3tunes infringed their copyrights in thousands of sound recordings and musical compositions.  The two services are MP3tunes.com, which primarily operated as a locker service for storing digital music, and sideload.com, which allowed users to search for free music on the internet.

On summary judgment, the United States District Court for the Southern District of New York (Pauley, J.) granted partial summary

---

[1] MP3tunes declared bankruptcy approximately two years before this case proceeded to trial.  It is not a party to this appeal.

judgment to the defendants, holding that MP3tunes had a reasonably implemented repeat infringer policy under § 512. A jury ultimately returned a verdict in favor of the plaintiffs, but the District Court partially overturned the verdict.

For reasons we explain below: (1) we **VACATE** the District Court's grant of partial summary judgment to the defendants based on its conclusion that MP3tunes qualified for safe harbor protection under the DMCA because the District Court applied too narrow a definition of "repeat infringer"; (2) we **REVERSE** the District Court's grant of judgment as a matter of law to the defendants on claims that MP3tunes permitted infringement of plaintiffs' copyrights in pre-2007 MP3s and Beatles songs because there was sufficient evidence to allow a reasonable jury to conclude that MP3tunes had red-flag knowledge of, or was willfully blind to, infringing activity involving those categories of protected material; (3) we **REMAND** for further proceedings related to claims arising out of the District Court's grant of partial summary judgment; and (4) we **AFFIRM** the judgment in all other respects.

## BACKGROUND

I.      MP3tunes.com and Sideload.com

Robertson founded MP3tunes in 2005.  It is undisputed that, by then, Robertson was familiar with both the online music industry and copyright litigation, having previously run the music site MP3.com, against which a copyright infringement judgment was entered in 2000.  See UMG Recordings, Inc. v. MP3.com, Inc., 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000). While recruiting for MP3tunes several years later, Robertson emphasized, "[T]his will be VERY big news.  Major labels selling MP3s.  MP3.com guy back to rejuvenate MP3 business.  Largest copyright infringer of all time back at it again.  Lots of juicy press angles."[2]

MP3tunes.com was MP3tunes's first project.  Initially, customers could visit MP3Tunes.com and purchase MP3 versions of music created by musicians who were not associated with major record labels.  In 2005 MP3tunes.com added a "locker storage" service, which charged users a fee to store music on the MP3tunes server.  A user who uploaded songs to her

---

[2] An MP3, otherwise known as an MPEG-1 Audio Layer 3, is a common digital audio compression algorithm used to make an audio file smaller without significantly reducing sound quality.  See Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc., 180 F.3d 1072, 1074 (9th Cir. 1999).

"locker" (through LockerSync, a free plugin on the site) could play the music through other internet-enabled devices.

MP3tunes owned and operated a second website, sideload.com, that allowed users to search for free music on the internet. Sideload.com offered a free plug-in to enable users to "sideload" (or upload directly to their MP3tunes lockers) free songs that they found on sideload.com. Songs sideloaded into users' lockers were then added to sideload.com's index of searchable songs. This meant that the more songs users sideloaded from the internet, the more free music became available through the website. MP3tunes's executives, including Robertson, used their own accounts with MP3tunes to store sideloaded songs.

Users of MP3tunes.com could store a certain amount of music through the service for free and could purchase additional storage space for tiered fees, while storage associated with sideloaded songs did not count against the free storage limit. Partly as a result, sideload.com became "the most effective partner in driving traffic to [MP3tunes's] locker service." Joint App'x 1930. At Robertson's direction, MP3tunes strove to expand sideload.com's catalog by encouraging users to upload songs to

the sideload.com index. For example, members of MP3tunes's staff were encouraged to upload songs from their own accounts, even when those songs came from websites that appeared to contain infringing material. Robertson directed MP3tunes employee Sharmaine Lindahl to provide MP3tunes employees a list of sites featuring free MP3s "for sideloading purposes." Joint App'x 1241. Lindahl observed that one of the sites on the list "look[ed] to be mainly pirated music." Joint App'x 1239. MP3tunes also encouraged repeated sideloading among MP3tunes.com users by creating a "Sideload Hall of Fame" consisting of the "top 25 Sideloaders with accounts at MP3tunes.com."

In October 2006 MP3tunes added a cover art feature. When a user began to "sync" or upload a song to her locker and cover art was not part of the music file, MP3tunes's software would "automatically go check for . . . cover art" provided on Amazon.com and download the cover art to MP3tunes's servers. Although MP3tunes had two agreements with Amazon, an Amazon operations analyst testified at trial that the copying of cover art violated the agreements. The analyst explained that "there was no reference to Amazon around th[e] cover image[s]" and that the

7

display of the cover art therefore "was not being used for the primary

purpose of driving traffic to Amazon," as the agreements required.

II.    Procedural History

In 2010 the parties cross-moved for summary judgment.  The District

Court granted the plaintiffs' summary judgment motion on certain claims

that are not the subject of this appeal, including the claims of direct

infringement by Robertson for the songs he personally sideloaded.  The

District Court also granted the defendants summary judgment on other

claims on the ground that MP3tunes qualified for safe harbor protection

under the DMCA and that the safe harbor barred the plaintiffs' state-law

claims for infringement of recordings "fixed" before February 15, 1972.[3]

The District Court also addressed § 512(i)(1)(A)'s requirement that a

service provider "adopt[] and reasonably implement[] . . . a policy that

provides for the termination in appropriate circumstances of

subscribers . . . who are repeat infringers."  The District Court held that

---

[3] A recording is "fixed" in this context when it is embodied in a permanent or stable medium that can be perceived, reproduced, or otherwise communicated.  17 U.S.C. § 101; see also Copyright Office, Copyright Registration for Sound Recordings, Copyright Circular #56, at 1 (the copyright law of the United States defines "sound recordings" as "works that result from the fixation of a series of musical, spoken, or other sounds").

MP3tunes had such a policy because it "demonstrated that it has a procedure for responding to DMCA takedown notifications and does not interfere with copyright owners' ability to issue such notices." Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627, 639 (S.D.N.Y. 2011). As proof of the existence and effectiveness of the procedure, the District Court pointed out that MP3tunes had "terminated the accounts of 153 users who allowed others to access their lockers and copy music files without authorization." Id. Finally, in a separate ruling related to Robertson's motion for summary judgment, the District Court determined that it had personal jurisdiction over Robertson because "MP3tunes did a significant amount of business with New York customers and Robertson exercised extensive control over MP3tunes." Special App'x 76.

Prompted by our subsequent decision in Viacom International, Inc. v. YouTube, Inc., 676 F.3d 19 (2d Cir. 2012), the District Court partially reconsidered its ruling that MP3tunes qualified for safe harbor protection under the DMCA. Whether MP3tunes was barred from the DMCA's safe harbor protection (because it was willfully blind to or had red-flag

knowledge of infringing activity), it held, actually presented a question of fact that a jury had to decide, not a question of law.

The case thereafter proceeded to trial before a jury, which returned a verdict for the plaintiffs and awarded them approximately $48 million, $7.5 million of which constituted punitive damages against Robertson. The District Court then granted judgment as a matter of law as to some of the claims. It reversed the jury's finding that MP3tunes was willfully blind or had red-flag knowledge regarding several different categories of songs on the ground that there was insufficient evidence of willful blindness or red-flag knowledge. Finally, it reduced the punitive damages award against Robertson to $750,000 on the ground that the $7.5 million punitive damages award violated due process.

This appeal and cross-appeal followed.

**DISCUSSION**

I.    The Plaintiffs' Appeal

The plaintiffs challenge three rulings made by the District Court: first, that MP3tunes reasonably implemented a repeat infringer policy and was eligible for DMCA safe harbor protection for pre- and post-1972

songs; second, that the jury's finding of red‑flag knowledge or willful

blindness with respect to certain categories of songs was wrong as a matter

of law; and third, that the plaintiffs were entitled to only one award of

statutory damages for songs where the copyright to the musical

composition and the copyright to the sound recording were owned by

different holders.

We address each of these challenges.

A. <u>"Reasonably Implemented" Repeat Infringer Policy</u>

The DMCA shields a service provider from liability for the

infringing acts of its users if the provider satisfies certain conditions.  One

of those conditions requires that a service provider "adopt[] and

reasonably implement[] . . . a policy that provides for the termination in

appropriate circumstances of subscribers and account holders of the

service provider's system or network who are repeat infringers."  17 U.S.C.

§ 512(i)(1)(A).  The plaintiffs argue that MP3tunes never reasonably

implemented a repeat‑infringer policy because it failed to track users who

repeatedly created links to infringing content in the sideload.com index or

who copied files from those links, which appeared on multiple takedown notices sent to MP3tunes.

In addressing this argument, we answer two questions: first, whether certain MP3tunes users qualified as "repeat infringers"; and second, if so, whether MP3tunes reasonably implemented a policy directed at them.

We begin with the first question. The District Court held that "[t]he purpose of subsection 512(i) is to deny protection to websites that tolerate users who flagrantly disrespect copyrights." Capitol Records, 821 F. Supp. 2d at 637. For the purposes of § 512(i)(1)(A), it defined a "repeat infringer" as a user who posts or uploads infringing content "to the internet for the world to experience or copy" knowing that the conduct infringes another's copyright. Id. at 638. In contrast, the District Court believed, a user who downloads or copies "songs from third-party sites for their personal entertainment" could not be a "repeat infringer."[4] Id. The District Court

---

[4] The District Court explained that, unlike users who upload infringing content, users who download "content for their personal use and are otherwise oblivious to the copyrights of others . . . like MP3tunes users who sideload content to their lockers for personal use, do not know for certain whether the material they download violates the copyrights of others." Id.

thus concluded that only users who upload infringing content are "blatant infringers that internet service providers are obligated to ban from their websites." Id.

We reject this definition of a "repeat infringer," which finds no support in the text, structure, or legislative history of the DMCA.

Starting with the text, we note that the DMCA does not itself define "repeat infringers." But "where a statute does not define a term, we give the term its ordinary meaning." Laurent v. PricewaterhouseCoopers LLP, 794 F.3d 272, 281 (2d Cir. 2015) (quotation marks omitted). In this context, we take "repeat" to mean "a person who does something . . . again or repeatedly," Oxford English Dictionary (3d ed. 2009), while an "infringer" is "[s]omeone who interferes with one of the exclusive rights of a . . . copyright," Infringer, Black's Law Dictionary (10th ed. 2014). Copyright infringement is a strict liability offense in the sense that a plaintiff is not required to prove unlawful intent or culpability, see Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121, 130 (2d Cir. 2008); Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304, 308 (2d Cir. 1963), and a user does not have to share copyrighted works in order to infringe a

copyright, cf. Arista Records, LLC v. Doe 3, 604 F.3d 110, 124 (2d Cir.

2010).  In the context of this case, all it takes to be a "repeat infringer" is to

repeatedly upload <u>or</u> download copyrighted material for personal use.

We turn next to the structure and context of the DMCA, interpreting

the term "repeat infringer" against the backdrop of the statute as a whole.

It is important to recall that the DMCA imposes certain requirements on

<u>service providers</u> in exchange for limitations on liability.  It would make

little sense to link that limitation on liability to the knowledge of <u>users</u>.[5]

Indeed, the DMCA explicitly relieves service providers from having to

affirmatively monitor their users for infringement—something that would

likely be required should MP3tunes have to ascertain its users' knowledge.

<u>See</u> 17 U.S.C. § 512(m)(1) ("Nothing in this section shall be construed to

---

[5] The Nimmer treatise on copyright law similarly links the term "repeat infringer" more directly to the knowledge of service providers rather than users.  <u>See</u> 4 Nimmer on Copyright § 12B.10.  The treatise defines an "infringer" for the purposes of § 512(i)(1)(A) as follows: "either a party who has been adjudicated to have committed copyright infringement, or a party about whom the service provider has actual knowledge that s/he has engaged in infringement."  <u>Id.</u> § 12B.10[B][3][c].  The treatise cautions that a service provider has to have done more than just receive a copyright holder's takedown notices in order to be charged with knowledge of infringement.  <u>Id.</u>  In this case, as will become clear, we need not decide whether takedown notices suffice on their own to prove that the provider was aware of infringement.

condition the applicability of [the DMCA safe harbors] on a service provider monitoring its service or affirmatively seeking facts indicating infringing activity."); Viacom, 676 F.3d at 41 ("[T]he safe harbor expressly disclaims any affirmative monitoring requirement—except to the extent that such monitoring comprises a 'standard technical measure' within the meaning of § 512(i)."); S. Rep. 105-190, at 52 (1998); H.R. Rep. 105-551(II), at 61 (1998) ("[T]he Committee does not intend [the repeat-infringer policy requirement] to undermine the principles of new subsection (l) or the knowledge standard of new subsection (c) by suggesting that a provider must investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing.").

The legislative history also confirms our view that the District Court's definition of "repeat infringer" as limited to willful infringement is too narrow. The Senate and House reports accompanying the DMCA recognize a difference between inadvertent and willful infringement. But both reports also assert that a "repeat infringer" requirement is meant to deter those "who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others." S. Rep.

105-190, at 52 (1998); H.R. Rep. 105-551(II), at 61 (1998) (emphasis added).

In other words, the legislative history of the DMCA indicates that a "repeat infringer" does not need to know of the infringing nature of its online activities, or to upload rather than download content.

Finally, none of our sister circuits has adopted the District Court's definition of "repeat infringer" to include only those who willfully infringe copyrights.  To the contrary, the Seventh Circuit has suggested that the term covers users of file-sharing services who are "ignorant or more commonly disdainful of copyright."  See In re Aimster Copyright Litig., 334 F.3d 643, 645 (7th Cir. 2003).

Our view of what Congress meant by the term "repeat infringer" leads us to conclude that the District Court improperly granted summary judgment.  Prior to trial, there was clearly enough disputed evidence relating to MP3tunes's policy regarding infringers to conclude that summary judgment was inappropriate.  To show that it reasonably implemented such a policy, MP3tunes proffered evidence at the summary judgment stage that it terminated 153 users who shared locker passwords. In response, though, the plaintiffs demonstrated that MP3tunes did not

even try to connect known infringing activity of which it became aware through takedown notices to users who repeatedly created links to that infringing content in the sideload.com index or who copied files from those links.  See Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1110 (9th Cir. 2007) ("[A] substantial failure to record webmasters associated with allegedly infringing websites may raise a genuine issue of material fact as to the implementation of the service provider's repeat infringer policy.").

Furthermore, the plaintiffs presented evidence that MP3tunes executives were encouraged to and did personally sideload songs from blatantly infringing websites.  See Pls.' Mem. Law Supp. Mot. Summ. J. (07-cv-9931 Docket No. 207) 12–14 (citing an email encouraging employees to sideload from a website containing "pirated" music).  The same executives made the songs available to sideload.com users.  There was also evidence that MP3tunes was capable of cataloging the sideloads of each MP3tunes user.  A jury could reasonably infer from that evidence that MP3tunes actually knew of specific repeat infringers and failed to take action.

A reasonable jury alternatively could have determined that MP3tunes consciously avoided knowing about specific repeat infringers using its services, even though the infringement was rampant and obvious. In Viacom, we held that "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." 676 F.3d at 35. Thus, at trial the plaintiffs could prevail by demonstrating that MP3tunes's failure to track users who created links to infringing content identified on takedown notices or who copied files from those links evidenced its willful blindness to the repeat infringing activity of its users.

Our conclusion that the District Court improperly granted partial summary judgment to MP3tunes on the basis of its policy regarding "repeat infringers" is not inconsistent with the DMCA's provision declaring "that safe harbor protection cannot be conditioned on 'a service provider monitoring its service or affirmatively seeking facts indicating infringing activity.'" Id. at 41 (quoting 17 U.S.C. § 512(m)(1)). Based on the available evidence, a reasonable jury could have concluded that it was reasonable for MP3tunes to track users who repeatedly created links to

infringing content in the sideload.com index or who copied files from those links. See Aimster, 334 F.3d at 655 ("The common element of [DMCA] safe harbors is that the service provider must do what it can reasonably be asked to do to prevent the use of its service by 'repeat infringers.'"). After all, MP3tunes had already tracked and removed 153 users "who allowed others to access their lockers and copy music files without authorization," Capitol Records, 821 F. Supp. 2d at 639; by comparison, requiring MP3tunes to extend that policy to users who sideloaded infringing content may not be an unreasonably burdensome request. Furthermore, doing so would not require MP3tunes to "monitor" or "affirmatively seek facts" about infringing activity in a manner inconsistent with § 512(m)(1) because it already had adequate information at its disposal in the form of takedown notices provided by EMI as to which links were allegedly infringing. Cf. Perfect 10, 488 F.3d at 1112–13 (declining to hold that the defendant service provider failed to implement its repeat infringer policy in a reasonable manner based on its receipt of takedown notices that did not substantially comply with § 512(c)(3) because the service provider would have had to "cobble together adequate

notice" and would therefore be "unduly burden[ed]"). MP3tunes would simply have had to make use of information already within its possession and connect that information to known users. While the defendants could yet make the case at trial that it was unreasonable under the circumstances to ask MP3tunes to identify users who repeatedly infringed plaintiffs' copyrights by sideloading music files, no evidence available at the summary judgment stage compelled that conclusion as a matter of law.

For these reasons, we vacate the District Court's grant of summary judgment and remand for further proceedings.[6]

B. <u>Red-Flag Knowledge and Willful Blindness</u>

We turn next to the District Court's determination that the jury's finding of red-flag knowledge or willful blindness with respect to certain categories of songs was wrong as a matter of law. We start with the

---

[6] In its summary judgment ruling, the District Court also held that MP3tunes was eligible for DMCA protection for pre-1972 sound recordings, which are protected by state rather than federal copyright law. The plaintiffs challenge this decision on appeal, but their challenge is foreclosed by our recent decision in <u>Capitol Records, LLC v. Vimeo, LLC</u>, 826 F.3d 78 (2d Cir. 2016). In <u>Vimeo</u>, we held that "the safe harbor established by § 512(c) protects a qualifying service provider from liability for infringement of copyright under state law." <u>Id.</u> at 93.

proposition that even if a service provider has a reasonably implemented repeat infringer policy, it relinquishes the DMCA's safe harbor if it, first, has "actual knowledge that the material or an activity using the material on the system or network is infringing" or "in the absence of such actual knowledge, is [] aware of facts or circumstances from which infringing activity is apparent," and second, "upon obtaining such knowledge or awareness, [does not] act[] expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(1)(A); see also 17 U.S.C. § 512(d)(1). At trial, the plaintiffs contended that MP3tunes was "aware of facts or circumstances from which infringing activity was apparent"—or in other words had "red-flag knowledge" or willful blindness, see Viacom, 676 F.3d at 31, 35, with respect to several categories of songs. The jury found that MP3tunes had knowledge as to four categories of files: (1) those stored on domains identified in takedown notices as having ten or more infringing files; (2) sideloads of MP3s before January 2007; (3) certain sideloads by MP3tunes executives; and (4) works by the Beatles. The District Court upheld the jury's finding of red-flag knowledge with respect to certain songs and subsets of songs but granted the defendants judgment

as a matter of law as to two categories of songs that are the subject of our review: MP3s from major labels issued before 2007, and all songs by the Beatles.

We have already explained that the DMCA does not impose "an amorphous obligation to take commercially reasonable steps in response to a generalized awareness of infringement." Viacom, 676 F.3d at 31 (quotation marks omitted). Accordingly, "[o]n the issue of disqualifying knowledge . . . the burden falls on the copyright owner to demonstrate that the service provider acquired knowledge of the infringement, or of facts and circumstances from which infringing activity was obvious, and failed to promptly take down the infringing matter, thus forfeiting its right to the safe harbor." Capitol Records, LLC v. Vimeo, LLC, 826 F.3d 78, 95 (2d Cir. 2016). In other words, a copyright owner must point to a defendant's "actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement." Viacom, 676 F.3d at 32.

With this principle in mind, we conclude that the trial evidence in this case, viewed in the light most favorable to the plaintiffs, see Izzarelli v.

R.J. Reynolds Tobacco Co., 731 F.3d 164, 167 (2d Cir. 2013), showed that MP3tunes and Robertson knew that major music labels generally had not even authorized their music to be distributed in the format most widely available on sideload.com, let alone authorized it to be shared on the internet. In particular, Robertson apparently knew that major record labels had not offered songs in MP3 format until 2007. In January 2007, in connection with MP3tunes's MP3 sale model, for example, Robertson admitted that "popular acts have never before sold tracks in MP3 formats." Joint App'x 3145–46. With respect to MP3s sideloaded before 2007, therefore, the jury reasonably could have concluded that MP3tunes and Robertson were aware of "facts and circumstances that make infringement obvious." Vimeo, 826 F.3d at 98.

What prompted the District Court to conclude otherwise? In granting judgment as a matter of law to the defendants on this issue, the District Court explained that barring MP3tunes from the DMCA safe harbor "would require Defendants to actively conduct routine searches and eliminate material likely to be infringing." Capitol Records, Inc. v. MP3tunes LLC, 48 F. Supp. 3d 703, 716 (S.D.N.Y. 2014). It therefore

understandably concluded that imposing such a duty clashed with the DMCA's "express . . . disavowal of a duty to affirmatively monitor."  Id.  Under the circumstances of this case, we respectfully disagree with the District Court's assessment, primarily for three reasons.

First, we think the jury could reasonably have found, based on the evidence presented, that MP3tunes had the ability to search sideload.com for MP3s sideloaded before a certain date.  Indeed, at trial an expert for the plaintiffs described how he obtained a list of MP3s sideloaded before January 26, 2007.  Joint App'x 1800–02.  His testimony demonstrated that searching through libraries of MP3 songs was a common function of MP3tunes's business.

Second, the jury was clearly instructed, and we presume it understood, that MP3tunes had no continuing, affirmative duty to monitor its servers for infringement.  The jury could comply with that instruction and still find that MP3tunes was required to disable access to pre-2007 songs by "act[ing] expeditiously to remove, or disable access to" the pre-2007 songs "upon obtaining such knowledge or awareness."  17 U.S.C. § 512(c)(1)(A)(iii).  The jury was permitted to conclude that a time-limited,

targeted duty—even if encompassing a large number of songs—does not give rise to an "amorphous" duty to monitor in contravention of the DMCA. Viacom, 676 F.3d at 31; see also id. at 34 (suggesting that a reasonable jury could find red-flag knowledge with respect to groups of clips).

The same is true of the Beatles songs. The jury heard evidence that Robertson was unaware of any legal online distribution of Beatles tracks before 2010, other than one track used within a video game. Robertson furthermore admitted that he authored a 2009 e-mail that showed he was aware of the plaintiffs' position that "[the] Beatles have never authorized their songs to be available digitally." Joint App'x 3165. MP3tunes was further made aware through user emails that Beatles songs such as "Strawberry Fields Forever" were on sideload.com's index. The jury could have reasonably concluded that MP3tunes had red-flag knowledge of, or was willfully blind to, the infringing nature of the Beatles tracks on its servers and failed to "act[] expeditiously" to remove them. 17 U.S.C. § 512(c)(1)(A)(iii).

Third, the jury could reasonably have found that MP3tunes conceived of and was designed to facilitate infringement based in part on evidence presented at trial that MP3tunes "actively encourage[ed] infringement" and that Robertson and MP3tunes executives "personally used [sideload.com] to download infringing material." Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1043 (9th Cir. 2013). Although such evidence might not alone support a separate finding of red-flag knowledge or willful blindness as to users, see Vimeo, 826 F.3d at 99, the jury could certainly rely on it in deciding whether MP3tunes was entitled to the DMCA safe harbor, see Fung, 710 F.3d at 1040 (holding that "aspects of the inducing behavior that give rise to liability are relevant to the operation of some of the DMCA safe harbors and can, in some circumstances, preclude their application"). Indeed, the jury could reasonably have understood Robertson to have admitted on cross-examination that sideload.com "was premised on the notion that everything that was on the internet that was not locked down could be sideloaded into the site." Joint App'x 2342. And in editing sideload.com's Frequently Asked Questions ("FAQs"), Robertson emphasized that the site should tell users that its music is "legal

to download" because "[s]ideload.com does not store any music, but rather links to files publicly available [in] other places on the net." Joint App'x 3017.

For these reasons, we reverse the District Court's ruling vacating the jury verdict with respect to red-flag knowledge and willful blindness for pre-2007 MP3s and Beatles songs.[7]

C. Statutory Damages

The plaintiffs also challenge the District Court's decision to allow only one award of statutory damages where the copyrights to the sound recording and to the musical composition are owned by separate plaintiffs. Section 504(c) of Title 17 provides that a "copyright owner may elect . . . to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work" in an amount of up to $30,000 if the infringer acted innocently or of up to $150,000 if the infringer acted willfully. "For the purposes of [§ 504(c)], all the parts of a compilation or derivative work constitute one

---

[7] We note that, should it be found on remand that MP3Tunes did not reasonably implement a repeat infringer policy and is therefore ineligible for DMCA safe harbor protection at all, the jury's finding of red-flag knowledge or willful blindness as to the above categories of songs would not be required to impose liability.

work."  17 U.S.C. § 504(c)(1); see Xoom, Inc. v. Imageline, Inc., 323 F.3d 279, 285 (4th Cir. 2003), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010).  A derivative work is "a work based upon one or more preexisting works, such as a . . . sound recording."  17 U.S.C. § 101.  If "there are several different versions of plaintiff's work, each of which commands a separate copyright," but "the defendant's work incorporates material covered by each of those copyrights," the Copyright Act "provides for but a single statutory damages award."  5 Nimmer on Copyright § 14.04[E][1][b].

As noted, the District Court held that the plaintiffs could recover only one statutory damages award for a musical composition and its corresponding sound recording, even where the composition and the recording were owned by separate plaintiffs.  In doing so, it agreed with those district courts that have concluded that infringement of a musical composition and its corresponding sound recording entitles a plaintiff to only one statutory damages award.  See, e.g., Spooner v. EEN, Inc., No. 08-CV-262-P-S, 2010 WL 1930239, at *4 (D. Me. May 11, 2010); see also Reservoir Media Mgmt., Inc. v. Craze Prods., No. 1:13-cv-1847 (GHW),

2015 WL 5692105, at *7 (S.D.N.Y. Sept. 28, 2015) (citing with approval

Judge Pauley's reasoning in Capitol Records, but declining to decide

whether the plaintiffs were entitled to multiple statutory damages awards

for a musical composition and its corresponding sound recording).  Other

courts, meanwhile, have explained that multiple statutory damages can be

awarded when the copyrights to the sound recording and the musical

composition are owned by different plaintiffs.  See, e.g., Teevee Toons, Inc.

v. MP3.com, Inc., 134 F. Supp. 2d 546, 548 (S.D.N.Y. 2001) (concluding that

"where . . . the plaintiffs owning the copyrights on the musical

compositions are separate from the plaintiffs owning the copyrights on the

sound recordings, each may recover statutory damages").

A plain reading of the Copyright Act's text supports the District

Court's conclusion.  See Patry on Copyright § 22:186 ("Sound recordings

are defined in section 101 as a species of derivative work of the underlying

musical composition, and, as such, both fall within the one work, one

award rule for statutory damages that only award[s] for infringement of

both works . . . regardless of whether there are different owners.").

Both the House Report and the Senate Report accompanying the

Copyright Act reinforce this point:

> Subsection (c)(1) [of 17 U.S.C. § 504] makes clear . . . that, although they are regarded as independent works for other purposes, "all the parts of a compilation or derivative work constitute one work" for th[e] purpose [of assessing statutory damages]. Moreover, although the minimum and maximum amounts are to be multiplied where multiple "works" are involved in the suit, the same is not true with respect to multiple copyrights, multiple owners, multiple exclusive rights, or multiple registrations. This point is especially important since, under a scheme of divisible copyright, it is possible to have the rights of a number of owners of separate "copyrights" in a single "work" infringed by one act of a defendant.

H.R. Rep. No. 94-1476, at 162 (1976); S. Rep. No. 94-473, at 144

(1975). In our view, then, Congress did not intend for separate

statutory damages awards for derivative works such as sound

recordings, even when the copyright owner of the sound recording

differs from the copyright owner of the musical composition.

In sum, the District Court's decision to permit only one

award of statutory damages for the musical composition and

corresponding sound recording comports with both the plain text

and the legislative history of the Copyright Act. We therefore

affirm that part of the judgment.

II.    Robertson's Appeal

Robertson's cross-appeal challenges several rulings of the District Court, some relating to the liability of MP3tunes and some relating to his own personal liability.  We address each challenge in turn.

A. MP3tunes's Liability

i.    Red-Flag Knowledge and Willful Blindness

Robertson challenges the District Court's ruling on red-flag knowledge and willful blindness.  In particular, he argues that the District Court erred in upholding the jury's verdict of red-flag knowledge and willful blindness with respect to songs sideloaded from personal file storage sites and student-run college webpages with what are alleged to be "obviously infringing" URLs.[8]

"The hypothetical 'reasonable person' to whom infringement must be obvious is an ordinary person—not endowed with specialized

_____

[8] Robertson also asserts that the District Court was wrong to conclude that MP3tunes had red-flag knowledge of the infringement of "Strawberry Fields Forever."  Because we reverse the District Court's determination regarding red-flag knowledge or willful blindness with respect to all Beatles songs, including "Strawberry Fields Forever," we need not address this argument.

knowledge or expertise concerning music or the laws of copyright."

Vimeo, 826 F.3d at 93–94.  That said, "[i]t is . . . entirely possible that an employee of the service provider . . . may well have known that [a] work was infringing, or known facts that made this obvious."  Id. at 97.  "If the facts actually known by an employee of the service provider make infringement obvious, the service provider cannot escape liability through the mechanism of the safe harbor."  Id.

The trial evidence supported the plaintiffs' argument that Robertson and MP3tunes executives knew that personal file storage sites and college student webpages were distributing infringing files.  There was also evidence that Robertson himself sideloaded from personal websites, and that other MP3tunes executives regularly sideloaded from these sites.  The jury could therefore conclude that MP3tunes knew that songs from sites with personal file storage or college URLs were available on sideload.com and that those sites were "obviously infringing," yet failed to act on that information.  For these reasons, we affirm the District Court's order denying judgment as a matter of law with respect to this category of songs.

ii.  Direct Liability for Infringement of Cover Art

At trial, the jury found that MP3tunes was liable for directly and willfully infringing all 296 works of cover art associated with the plaintiffs' songs and albums.  The District Court partially upheld that jury verdict when it ruled on Robertson's motion for judgment as a matter of law, although it granted the motion and vacated the verdict as to some of the cover art.  On appeal, Robertson contends that the entire verdict relating to cover art infringement should have been vacated.  We disagree.

"[V]olitional conduct is an important element of direct liability." Cartoon Network, 536 F.3d at 131.  The District Court instructed the jury as follows: "When a person or company itself copies, distributes, publicly performs, or displays the copyrighted work without authorization or other defense, it is considered a 'direct infringement.'  In order to be a direct infringer, a person or company must have engaged in a volitional act that causes the alleged copying."  Joint App'x 4380.  Robertson asserts that MP3tunes could not have engaged in a "volitional act" with respect to the cover art infringement because the retrieval of that art was not directed by

MP3tunes but rather obtained from Amazon.com at the direction of the user when the user selected a song.

The record contradicts Robertson on this point. MP3tunes's employees testified that the company's LockerSync system was designed to retrieve one aspect of a copyrighted work (the album art) whenever a user uploaded another aspect of a copyrighted work (the song). In other words, the system retrieved a copyrighted item that a user did not request, frequently without the user's knowledge of the copyrighted nature of the item. This constituted enough evidence, in our view, that copying of the cover art was directed by MP3tunes, not users.[9] And a jury reasonably could also infer that each of the 296 images had been downloaded from Amazon.com at least once because the evidence presented at trial showed that each image was actually downloaded several times.

Robertson follows up by arguing that the plaintiffs' cover art copyrights themselves are invalid. First, he contends, the plaintiffs improperly used a Form SR (also used for the corresponding sound

---

[9] For the same reason, we reject Robertson's argument that MP3tunes was entitled to DMCA protection under § 512(c) for cover art infringement. As Robertson acknowledges, the subsection covers only "infringement of copyright by reason of the storage <u>at the direction of a user</u>." 17 U.S.C. § 512(c)(1) (emphasis added).

recording) to register the cover art copyrights. We reject that argument.

Pursuant to 37 C.F.R. § 202.3, the SR class "includes all published and unpublished sound recordings," and "[c]laims to copyright in literary, dramatic, and musical works embodied in phonorecords may also be registered in this class under paragraph (b)(4) of this section" if certain conditions are met. Because visual works are not explicitly listed as a category that can also be included in SR copyrights, Robertson argues that the plaintiffs' registration of cover art on Forms SR renders their cover art copyrights invalid. But a few years ago the Copyright Office issued a circular that expressly sanctioned the use of a Form SR to register both the recording and associated images. See Copyright Office, Copyright Registration for Sound Recordings, Copyright Circular #56, at 3 (Aug. 2012) (providing instructions for how to fill out a Form SR "if the claim includes artwork, photographs, and/or liner notes"). The Copyright Office's interpretations of the Copyright Act are entitled to some deference insofar as we deem them to be persuasive. See Morris v. Bus. Concepts, Inc., 283 F.3d 502, 505–06 (2d Cir. 2002). Here, we are persuaded by the Copyright Office's apparent view that there is no logical distinction

between "literary" works and "visual" works associated with a sound recording such that the former is properly registered on a Form SR but the latter is not.

Robertson separately claims that the copyrights are invalid because the Forms SR fail to list the authors of the cover art. But the forms were registered as works-for-hire, which do not require a separate identification of artists. Moreover, a certificate of registration with inaccurate information is invalid only if, among other things, the registrant knew it was inaccurate. 17 U.S.C. § 411. There is no evidence on this record that the certificates of registration at issue here were inaccurate. And, even if there were, there is no evidence that the plaintiffs knew the copyrights inaccurately described authorship.

iii.   Liability for Infringement by MP3tunes Executives

In addition to finding MP3tunes liable for its own infringement and for the infringement of its users, the jury held MP3tunes liable for the sideloading activity of three MP3tunes executives (Emily Richards, Douglas Reese, and Mark Wooten) under a theory of respondeat superior. Robertson argues that there was insufficient evidence that these employees

acted within the scope of their authority and in furtherance of MP3tunes's business when downloading the challenged songs.

We think there was sufficient evidence for a rational jury to conclude that MP3tunes was liable under a respondeat superior theory. Among other evidence admitted at trial, Reese wrote an email asserting that "we [MP3tunes employees] would see[d] the [sideload.com] index with higher quality tracks." Joint App'x 2049. An MP3tunes employee testified that she and other MP3tunes employees "specifically sought out websites on the Internet to locate files and sideload them into the Sideload index," and that they all did so "as employees of MP3tunes." Joint App'x 2057. Robertson directed that the same employee provide other MP3tunes employees a "list of some sites featuring free MP3s" "for sideloading purposes." Joint App'x 1957. There was also ample evidence from which a juror could reasonably have inferred that these executive sideloads were performed from MP3tunes's offices. And it was clearly in MP3tunes's interest to increase the number of quality songs on sideload.com by using its employees to expand the index.

B. Robertson's Liability

i. Personal Jurisdiction

Robertson challenges the District Court's personal jurisdiction ruling on various grounds. We review a District Court's ruling on personal jurisdiction de novo. See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002).

Relying on Walden v. Fiore, 134 S. Ct. 1115 (2014) and Daimler AG v. Bauman, 134 S. Ct. 746 (2014), Robertson argues as an initial matter that the District Court erred in imputing MP3tunes's contacts with New York to him. But Robertson was no mere employee of MP3tunes. He was its founder and CEO, and he exercised extensive control over MP3tunes's day-to-day activities. According to one MP3tunes employee, "no one made any final decisions other than Michael." Joint App'x 1173. Under these circumstances, it was appropriate for the District Court to consider the scope of MP3tunes's activities in New York in evaluating whether it could exercise personal jurisdiction over Robertson. See Retail Software Servs., Inc. v. Lashlee, 854 F.2d 18, 23 (2d Cir. 1988). "[T]his is not a case

where an individual defendant who is unaffiliated with a corporation is being haled into court by a large multinational corporation." Id.[10]

Robertson also argues that, in any event, he and MP3tunes combined lacked sufficient "minimum contacts" as required by the Due Process Clause. But Robertson was aware both that MP3tunes had at least 400 users located in New York and that his company provided services to New York customers. Under these circumstances, the District Court's exercise of personal jurisdiction over Robertson comported with due process. He knew, in other words, that MP3tunes had "purposefully

[10] Neither Daimler nor Walden compels a different conclusion. Daimler addressed general jurisdiction, not specific jurisdiction, and Robertson does not dispute that there is an "affiliation between the forum [of New York] and the underlying controversy" such that only specific jurisdiction is needed over Robertson. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)). The Supreme Court expressly declined to "pass judgment on invocation of an agency theory in the context of general jurisdiction." Daimler AG, 134 S. Ct. at 759-60. Meanwhile Walden held that a defendant's relationship with a forum state "must arise out of contacts that the 'defendant himself' creates with the forum State." 134 S. Ct. at 1122 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). But the Court in Walden emphasized only that personal jurisdiction cannot arise from contacts between the plaintiff or third parties and the forum State. Id. It left unaddressed the role of a corporation's activities in evaluating a court's personal jurisdiction over its top executive, including where the executive is, as here, intimately involved with all aspects of the company's operation.

avail[ed] [it]self of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." See Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 171 (2d Cir. 2010) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). "[J]urisdiction is appropriate in New York because [MP3tunes] has developed and served a market for its products there." Id. That MP3tunes served a national market, as opposed to a New York-specific market, has little bearing on our inquiry, as attempts to serve a nationwide market constitute "evidence of [the defendant's] attempt to serve the New York market, albeit indirectly." Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 243 (2d Cir. 1999); see Chloé, 616 F.3d at 171.

Finally, Robertson insists that the District Court should have required the plaintiffs to establish that the District Court had personal jurisdiction over him by a preponderance of the evidence at a hearing or at trial. But we are not persuaded that the District Court erred in determining that it had personal jurisdiction over Robertson without holding a hearing or putting that issue to the jury. On a summary judgment motion, a judge may "properly examine[] the record to

determine if there [are] undisputed facts that could resolve the jurisdictional issue." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990). Robertson did not challenge the facts that the District Court deemed most persuasive in finding personal jurisdiction: that he had engaged in previous litigation with record companies in New York based on similar infringing activities; that MP3tunes had a number of users in New York; and that Robertson had extensive control over MP3tunes. See Joint App'x 1135. For these reasons, we conclude that the District Court did not err in determining at the summary judgment stage that it could exercise personal jurisdiction over Robertson.

   ii. Vicarious and Contributory Liability

In addition to attacking the District Court's exercise of personal jurisdiction over him, Robertson argues that there was insufficient evidence to support the jury's finding that he was vicariously or contributorily liable for MP3tunes's infringements. In the same vein, he adds that the District Court's jury instructions regarding vicarious and contributory liability were erroneous.

We start with Robertson's challenge to the jury's vicarious liability finding and the District Court's jury instructions. Vicarious liability for copyright infringement may arise only when the defendant had the "right and ability to supervise [that] coalesce[d] with an obvious and direct financial interest in the exploitation of copyrighted materials." Softel, Inc. v. Dragon Medical & Sci. Commc'ns, Inc., 118 F.3d 955, 971 (2d Cir. 1997) (alteration in original) (quoting Shapiro, 316 F.2d at 307). An increase in subscribers or customers due to copyright infringement qualifies as an "obvious and direct financial interest." See Shapiro, 316 F.2d at 307. With these principles in mind, we conclude that the District Court did not err when it instructed the jury that an "obvious and direct financial interest . . . may be established where infringing material acts as a 'draw' to attract subscribers to a defendant's business, even if it is not the primary, or even a significant draw." Joint App'x 2423–24; see also Owen v. Thermatool Corp., 155 F.3d 137, 139 (2d Cir. 1998).

And here there was ample evidence to support the jury's finding, aided by a proper instruction, that Robertson was vicariously liable for copyright infringement. Among other things, an MP3tunes employee

testified that she and other employees "used Sideload marketing efforts to try to get people to sign up for lockers" and emphasized the availability of free music on sideload.com "in connection with trying to get users to purchase lockers." Joint App'x 2059. Meanwhile, Robertson sought to use sideload.com to attract free users to MP3tunes whom MP3tunes could thereafter "upsell" to premium lockers. Joint App'x 2337. There was also evidence that Robertson, through a trust, was the near-exclusive funder of MP3tunes and thus had an "obvious and direct financial interest" in infringement that drew subscribers to MP3tunes.com. Cf. Softel, 118 F.3d at 971. The jury thus had sufficient evidence to find Robertson vicariously liable in this case.

Robertson's challenge to the jury's contributory liability finding fares no better. A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971). "[O]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to

foster infringement, is liable for the resulting acts of infringement by third parties." Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 919 (2005).

Based on our review of the trial record, we reject Robertson's challenge to the jury's verdict finding him liable for contributory infringement based on the infringing activities of both MP3tunes executives and MP3tunes users. Robertson personally encouraged his employees to sideload songs to add to the index. Many of those songs were from sites that contained "pirated material." The entire point of sideloading to the index was to make more music available for user download—even though Robertson knew the music was generally not available for free in MP3 form. See id. at 936. This, in turn, aided and abetted infringement by sideload.com users.

Nor are we persuaded by Robertson's argument that the District Court should have instructed the jury that his participation needed to be substantial and to have had a direct relationship to the infringement in order to find him liable for contributory infringement. The District Court instructed the jury as follows: "A defendant is liable for contributory

infringement if, one, with knowledge of the infringing activity, two, that defendant introduces, causes, or materially contributes to the infringing conduct of another." Joint App'x 2424. We have not previously insisted on use of the phrase "substantially contributes" rather than "materially contributes" in the context of a jury instruction about contributory infringement. To the contrary, we have more often regarded the words "material" and "substantial" as synonymous. See Substantial, Black's Law Dictionary (10th ed. 2014). We conclude that the District Court's use of the phrase "materially contributes" rather than "substantially contributes" was not misleading and adequately informed the jury of the law. See Owen, 155 F.3d at 139. We also think that the District Court was not required to instruct the jury specifically that there had to be a "direct relationship" between the contributor's activities and the infringement. We have never held that such an instruction was necessary. In any event, the District Court's instruction adequately captured the necessary relationship when it reminded the jury that a defendant "materially contributes to the infringing conduct of another if the defendant engages

in personal conduct that is part of, encourages, or assists the infringement." Joint App'x 2425.

Robertson relies on <u>Sony Corp. of America v. Universal City Studios, Inc.</u>, 464 U.S. 417, 442 (1984), to suggest more broadly that he cannot be held secondarily liable as a matter of law. In <u>Sony</u>, the Supreme Court held that when a product is capable of "substantial noninfringing uses," its manufacturer cannot be liable simply for knowing that the product could be used in a way that would constitute infringement. <u>Id.</u> at 456. But the Supreme Court has since clarified that "where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, <u>Sony</u>'s staple-article rule will not preclude liability." <u>Grokster</u>, 545 U.S. at 935. Here, the evidence showed that Robertson acted in a manner intended to promote infringement. We therefore reject Robertson's argument based on <u>Sony</u>.

C. <u>Damages</u>

Finally, Robertson challenges the District Court's award of statutory and punitive damages. We address each challenge in turn.

i.    Statutory Damages

Robertson claims that the District Court's award of multiple statutory damages for music singles and the albums on which they appear was error.  As previously noted, statutory damages are awarded for infringement of each copyrighted "work."  17 U.S.C. § 504(c).  Several of the songs relevant to the trial were issued both as singles and as part of albums.  The District Court instructed the jury that, so long as the plaintiffs proved that "on the date of infringement, each individual sound recording at issue in this case was available for purchase as a single," it could issue multiple statutory damages awards for singles that appeared on the same album.  Capitol Records, 48 F. Supp. 3d at 721.  The jury found that each song was available for purchase as a single on the date of infringement.

Materials that are sold as part of a compilation, such as songs on an album, ordinarily are not deemed separate works for the purpose of determining statutory damages.  See Bryant v. Media Right Prods., Inc., 603 F.3d 135, 141 (2d Cir. 2010); 17 U.S.C. § 504(c)(1) ("[A]ll the parts of a compilation . . . constitute one work.").  But when a copyright holder or publisher issues material on an independent basis, the law permits a

statutory damages award for each individual work. See Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1381 (2d Cir. 1993). In other words, our "focus[] [is] on whether the plaintiff—the copyright holder—issued its works separately, or together as a unit." Bryant, 603 F.3d at 141. For these reasons, we conclude that the District Court properly allowed separate statutory damages awards for songs that the plaintiffs issued as singles, even if those songs were also made available on albums.

And there was evidence at trial that all the songs in question were made available as singles on the date of infringement. For example, an EMI and Capitol Records executive testified that, with the exception of tracks by Bob Seger and the Beatles, as well as one track by Pink Floyd, EMI's entire catalog was available for download and sale as singles, Joint App'x 2476–82, and that this amounted to "95 to 98 percent of our total catalogue available," Joint App'x 2482. Based on this and other evidence, the District Court did not err in upholding the jury's verdict of statutory damages.

ii.   Punitive Damages

In addition to statutory damages on the plaintiffs' Copyright Act claims, the jury awarded $7.5 million in punitive damages against Robertson on the plaintiffs' common law claims.  Robertson now argues that the reduced award of $750,000 violated his right to due process.  We disagree.  In granting this reduced award, the District Court properly analyzed the factors enumerated in State Farm Mutual Automobile Insurance Co. v. Campbell: "the degree of reprehensibility of [Robertson's] misconduct"; "the actual or potential harm suffered by the plaintiff" as compared to "the punitive damages award"; and "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  538 U.S. 408, 418 (2003).

**CONCLUSION**

We have considered the parties' remaining arguments on appeal and conclude that they are without merit.  For the foregoing reasons, we:

(1) **VACATE** the District Court's grant of partial summary judgment to the defendants based on its conclusion that MP3tunes qualified for safe

harbor protection under the DMCA because the District Court applied too narrow a definition of "repeat infringer";

(2) **REVERSE** the District Court's grant of judgment as a matter of law to the defendants on claims that MP3tunes permitted infringement of plaintiffs' copyrights in pre-2007 MP3s and Beatles songs because there was sufficient evidence to allow a reasonable jury to conclude that MP3tunes had red-flag knowledge of, or was willfully blind to, infringing activity involving those categories of protected material;

(3) **REMAND** for further proceedings related to claims arising out of the District Court's grant of partial summary judgment; and

(4) **AFFIRM** the judgment in all other respects.