**16-2825-cv(L)**
*BWP Media USA Inc. v. Polyvore, Inc.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

August Term, 2017

Argued: September 19, 2017
Decided: April 17, 2019

Nos. 16-2825-cv, 16-2992-cv

BWP Media USA Inc., dba Pacific Coast News, Pacific Coast News,
National Photo Group, LLC,
*Plaintiffs-Appellants-Cross-Appellees,*

*v.*

Polyvore, Inc.,
*Defendant-Appellee-Cross-Appellant.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 13 Civ. 7867 – Ronnie Abrams, *Judge.*

————

Before: Newman, Walker, and Pooler, *Circuit Judges.*

————

BWP Media USA Inc., Pacific Coast News, and National Photo Group, LLC (collectively "BWP"), appeal from a memorandum and order of the United States District Court for the Southern District of New York (Ronnie Abrams, *J.*) that granted summary judgment to Polyvore, Inc. ("Polyvore") on BWP's copyright claims for direct and secondary infringement and denied BWP's cross-motion for summary judgment on direct infringement. The district court also denied Polyvore's motion for sanctions under 17 U.S.C. § 505.

We conclude that the district court's grant of summary judgment to Polyvore on the direct infringement claim was error because there is a dispute of material fact regarding whether Polyvore created multiple copies of BWP's photos that were not requested by Polyvore users. We further conclude that questions of material fact preclude us from holding at this stage that Polyvore satisfied the requirements for the Digital Millennium Copyright Act (DMCA) § 512(c) safe harbor, even though BWP has not shown that Polyvore's stripping of metadata disqualifies it from safe harbor protection. We agree with the district court, however, that Polyvore is entitled to summary judgment on BWP's secondary infringement claims of contributory, vicarious, and inducement of infringement because the district court found that BWP abandoned those claims. And we find

no error in the district court's decision not to sanction BWP. We therefore AFFIRM the district court's grant of summary judgment dismissing BWP's secondary infringement claims, AFFIRM the denial of attorney's fees, VACATE the judgment as to direct infringement, and REMAND for further proceedings pursuant to the principles and procedures set out *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994).

Judges Walker, Newman and Pooler concur in separate opinions.

‗‗‗‗‗‗‗

CRAIG B. SANDERS, Sanders Law, PLLC, Garden City, NY, *for Plaintiffs-Appellants-Cross-Appellees*.

ORIN SNYDER (Ester Murdukhayeva, *on the brief*), Gibson, Dunn & Crutcher LLP, New York, NY, *for Defendant-Appellee-Cross-Appellant*.

Robert Reeves Anderson, Arnold & Porter LLP, Denver, CO, John C. Ulin, Kathryn W. Hutchinson, Stephanie S. Roberts, Arnold & Porter LLP, Los Angeles, CA, *for amicus curiae*, Copyright Alliance, *in support of Plaintiffs-Appellants-Cross-Appellees*.

Seth D. Greenstein, Constantine Cannon LLP, Washington, D.C., *amici curiae*, The Consumer Technology Association and The Computer & Communications Industry Association, *in support of Defendant-Appellee-Cross-Appellant*.

Mitchell L. Stoltz, Daniel Nazer, Kit Walsh, Electronic Frontier Foundation, San Francisco, CA, *for amici curiae*, Electronic Frontier Foundation, Center for Democracy and Technology,

and Public Knowledge, *in support of Defendant-Appellee-Cross-Appellant*.

Kelly M. Klaus, David J. Feder, Munger, Tolles & Olson LLP, Los Angeles, CA, *for amicus curiae*, Motion Picture Association of America, Inc., *in support of neither party*.

_____

PER CURIAM:

BWP Media USA Inc., Pacific Coast News, and National Photo Group, LLC (collectively "BWP") appeal from a memorandum and order of the United States District Court for the Southern District of New York (Ronnie Abrams, *J.*) that granted summary judgment to Polyvore, Inc. ("Polyvore") on BWP's copyright claims for direct and secondary infringement and denied BWP's cross-motion for summary judgment on direct infringement. The district court also denied Polyvore's motion for sanctions under 17 U.S.C. § 505.

We conclude that the district court's grant of summary judgment to Polyvore on the direct infringement claim was error because there is a dispute of material fact regarding whether Polyvore created multiple copies of BWP's photos that were not requested by Polyvore users. We further conclude that questions of material fact preclude us from holding at this stage that Polyvore satisfied the requirements for the Digital Millennium Copyright Act (DMCA) § 512(c) safe

harbor, even though BWP has not shown that Polyvore's stripping of metadata disqualifies it from safe harbor protection. We agree with the district court, however, that Polyvore is entitled to summary judgment on BWP's secondary infringement claims of contributory, vicarious, and inducement of infringement because the district court found that BWP abandoned those claims. And we find no error in the district court's decision not to sanction BWP. We therefore AFFIRM the district court's grant of summary judgment dismissing BWP's secondary infringement claims, AFFIRM the denial of attorney's fees, VACATE the judgment as to direct infringement, and REMAND for further proceedings pursuant to the principles and procedures set out *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994). We request that the district court file its response within 60 days from the issuance of this opinion or as soon as practicable thereafter, and that upon such determination, the parties promptly notify the clerk of this court, whereupon jurisdiction will be restored to this court.

The facts are set forth in Judge Walker's separate concurring opinion, which also specifies the questions of material fact that remain for determination by the district court. Judge Newman concurs in the result with a separate opinion. Judge Pooler concurs in the result with a separate opinion.

John M. Walker, Jr., Circuit Judge, concurring in the result.

I write separately to set out the facts and questions of material fact that remain for determination by the district court, as well as to describe my reasoning regarding each of our conclusions.

## BACKGROUND

The following facts are undisputed. Defendant-appellee Polyvore is an internet service provider that ran a website, Polyvore.com, that allowed users to create and share digital photo collages devoted to fashion, art, and design.[1] Polyvore.com's "Clipper" tool let users "clip" images from other websites and collect them on Polyvore's site. Once a user clipped an image, they could store, modify, crop, or superimpose it on top of other images to make a digital photo collage, which Polyvore called a "set." Users could

---

[1] Polyvore's website appears to no longer exist. *See* Lucas Matney, *Polyvore is Shutting Down After Being Acquired by Fashion Retailer Ssense*, TECHCRUNCH, Apr. 5, 2018, https://techcrunch.com/2018/04/05/polyvore-is-shutting-down-after-being-acquired-by-fashion-e-commerce-site-ssense/ (last visited April 16, 2019). Even if that is the case, however, BWP's core claims for damages are unaffected because, "[u]nlike claims for injunctive relief challenging ongoing conduct, a claim for damages cannot evade review" since "it remains live until it is settled, judicially resolved, or barred by a statute of limitations." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 77 (2013). On the other hand, BWP's request for a permanent injunction would now be moot because Polyvore's defunct website no longer displays plaintiffs' photos. *See Bank of New York Co. v. Ne. Bancorp, Inc.*, 9 F.3d 1065, 1067 (2d Cir. 1993) (holding that requests for injunctions are "mooted by the occurrence of the action sought to be enjoined").

2

share their sets with other Polyvore users, comment on other users' sets, and submit their sets in contests to win prizes. At the time this suit was filed, Polyvore's website attracted 14.2 million visitors a month.

When a user uploaded an image to Polyvore.com, it triggered a series of automatic technical processes: Polyvore (1) attached a hyperlink to that image that linked back to the image's original site; (2) gave the image a unique Uniform Resource Locator ("URL") that identified its precise location on Polyvore's website, Polyvore.com; and (3) indexed the photo so it was searchable on Polyvore.com. All posted images were displayed automatically by software—meaning Polyvore employees did not review or interact with user-posted images before they appeared on the site. Based on these user uploads, Polyvore.com had an extensive library of searchable images—118 million when the complaint was filed.

Because some photos clipped by users were copyrighted images, Polyvore had policies in place that were designed to combat copyright infringement, including terms of service that prohibited users from posting copyrighted images, a repeat-infringer policy, and a notice-and-takedown system.

BWP owns copyrights in celebrity photographs, which it licenses to online and print publications for a fee. At issue in this case

3

are at least seventy-nine of BWP's photographs that appeared on Polyvore.com without BWP's permission.[2] The images include photos of celebrities such as McKayla Maroney, Carly Rae Jepsen, Ryan Gosling, Kim Kardashian, and Selena Gomez. In November 2013, BWP sued Polyvore for copyright infringement alleging that Polyvore's posting of the photos violated BWP's exclusive rights under the Copyright Act to reproduce and display its images publicly. *See* 17 U.S.C. § 106(1), (5). In its first amended complaint, BWP sought relief for (1) direct copyright infringement, (2) contributory copyright infringement, (3) vicarious copyright infringement, and (4) inducement of copyright infringement. Polyvore moved to dismiss, but the district court denied the motion. Relying on, among other things, BWP's allegation that Polyvore employees actively worked with the photographs, the district court found that BWP had stated direct and secondary infringement claims. The case proceeded to discovery.

As part of discovery, BWP produced a document containing the URLs and upload dates of the images at issue, as well as screenshots showing its images displayed on Polyvore's website; Polyvore served initial disclosures and identified witnesses with

---

[2] Although BWP alleged infringement with respect to eighty-one images, the parties dispute whether two photos belonging to BWP were actually copied.

4

knowledge about facts alleged in the complaint. Because the software programs most relevant to BWP's claims were highly technical, the parties agreed that instead of producing code, Polyvore would make available witnesses who could be deposed about the site's design and functionality. During the seven-month discovery period, however, BWP never took a single deposition. With the record therefore essentially the same as it had been before discovery, Polyvore moved for summary judgment, arguing that BWP had not substantiated its direct or secondary liability claims.

In its opposition to that motion, BWP argued that Polyvore was not entitled to summary judgment on its direct infringement claims because Polyvore itself (1) copied, stored, and displayed BWP's images, and (2) interfered with a "standard technical measure" by stripping metadata from BWP's images, therefore disqualifying it from the protection of the safe harbor provisions of the DMCA which deny protection to ISPs that interfere with measures "used by copyright owners to identify or protect copyrighted works." 17 U.S.C. § 512(i)(2).

To support its claims, BWP attached to its motion for summary judgment a spreadsheet prepared by BWP's counsel listing eighty-five different images that appeared on Polyvore's website stripped of their metadata. The spreadsheet also included nine separate Polyvore

5

URLs for each image—an original link and then a link to the same image reproduced in eight different sizes, "e," "g," "l," "m," "s," "t," "x," and "y." None of the images that the spreadsheet listed as having been copied nine times (including the original clipped image), however, were images at issue in this case. Relying on the evidence of the additional URLs, BWP cross-moved for summary judgment on direct infringement, arguing that Polyvore's copying and display of BWP's images "separate and apart" from the images its users clipped established direct infringement as a matter of law.

After finding no evidence that Polyvore acted volitionally, the district court granted Polyvore's motion for summary judgment on all claims, denied BWP's motion for summary judgment on its direct infringement claim, and denied Polyvore's request for fees. Because the district court found no infringing conduct, it did not address Polyvore's safe harbor defense under the DMCA. BWP appealed, and Polyvore cross-appealed.

**DISCUSSION**

On appeal, BWP principally argues that (1) Polyvore directly infringed its copyrights by designing the Clipper to retrieve photos from other websites, displaying BWP's images at the request of users, and making and displaying multiple, unrequested copies of user-uploaded images; and (2) the DMCA does not shield Polyvore from

6

its own directly infringing acts, or any of its other acts, because Polyvore altered the metadata of user-uploaded images and because some of the infringing conduct was directed by Polyvore, not its users.[3]

We review a district court's grant of summary judgment *de novo. Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015). "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)) (citation omitted). "The same standard applies where, as here, the parties filed cross-motions for summary judgment and the district court granted one motion, but denied the other." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable

---

[3] BWP also attempts to press its secondary infringement claims on contributory and vicarious infringement theories. However, on remand from this court, the district court concluded that *Jackson v. Federal Express* "counsels in favor of" finding that BWP has abandoned these claims. *See Jackson v. Federal Express*, 766 F.3d 189, 196–98 (2d Cir. 2014) (holding that a counseled party who partially opposed a motion for summary judgment had abandoned those claims it did not specifically oppose because "the papers and circumstances viewed as a whole" indicate "that abandonment was intended"). We have no reason to reject the district court's finding that in this case "the papers and circumstances viewed as a whole" indicate that BWP abandoned its secondary infringement claims. *Jackson*, 766 F.3d at 196–97.

inferences must be drawn against the party whose motion is under consideration." *Id.* (citation omitted). Even when both parties contend that there are no genuine issues of material fact, we are not bound to enter judgment for either of the parties, because this court may discern material factual disputes on its own. *Id.*

## I.   Direct Infringement

The district court granted summary judgment for Polyvore on BWP's direct infringement claims. Applying *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) [hereinafter "*Cablevision*"], the district court found that BWP had failed to show the "volitional conduct" on the part of Polyvore necessary to establish its liability. On appeal, BWP argues that *Cablevision*'s volitional conduct requirement was abrogated by *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014), and that therefore liability for direct copyright infringement does not require a showing of volitional conduct. I begin by briefly recounting the evolution of the volitional conduct requirement in order to answer the abrogation question. Next, with this background in mind, I apply the volitional conduct requirement to the facts of this case. Finally, I address the arguments regarding the volitional conduct requirement raised by Judge Newman in his concurring opinion.

## A. The Volitional Conduct Requirement

Section 106 of the Copyright Act gives copyright holders an exclusive bundle of rights, including the right "to reproduce the copyrighted work in copies," and the right to "display the copyrighted work publicly." 17 U.S.C. § 106(1), (5). The Copyright Act makes parties who infringe on those rights liable for damages, regardless of whether they had knowledge that the content was infringing. *See* 17 U.S.C. § 504. In other words, the Copyright Act is a strict liability regime. *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016) [hereinafter "*MP3tunes*"], *cert. denied sub nom. Robertson v. EMI Christian Music Grp., Inc.*, 137 S. Ct. 2269 (2017).

The advent of the internet posed a problem for this regime, however, since applying strict liability to infringing content posted online meant that websites could be held liable for infringing content posted by their users based solely on the existence of the website—an outcome that could be unfair. *See, e.g.*, *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1368–70 (N.D. Cal. 1995). In response, beginning in the mid-1990s, courts began to read into the Copyright Act an implicit requirement that for a service provider to be liable for direct infringement, it must have taken some affirmative, volitional step to infringe. *See id.* The doctrine posits that to hold a service provider liable for direct copyright infringement,

that infringement must have resulted from the provider's own volitional conduct. *See id.*

Ten years ago in *Cablevision*, we adopted the volitional conduct requirement in this circuit as a prerequisite to establishing copyright infringement liability for service providers, holding that "volitional conduct is an important element of direct liability." 536 F.3d at 131.[4] In that case, we considered a direct infringement suit brought by owners of copyrighted television programs against a remote-service digital video recorder ("DVR") company, Cablevision. *Id.* Cablevision's product allowed subscribers to direct that a live program be recorded and saved remotely so the user could watch it later. *Id.* at 125. Both the parties and the district court in that case analogized Cablevision's actions to that of a copy shop. *Id.* at 131–32. We concluded that because Cablevision "more closely resemble[d] a store proprietor who charges customers to use a photocopier on his premises," it was "incorrect to say, without more, that such a proprietor 'makes' any copies when his machines are actually operated by his customers." *Id.* at 132.

---

[4] Judge Newman's concurrence correctly notes that volitional conduct is not a legal component of a direct liability cause of action, and that the use of the term "element" in the *Cablevision* opinion is therefore somewhat imprecise. 536 F.3d at 131. As the author of the *Cablevision* opinion, I agree that volitional conduct is not an element of a cause of action for direct liability, but rather a factual component that must be established when the identity of the infringer is in doubt.

10

Subsequently, in *Aereo*, we considered a direct copyright infringement claim brought by holders of copyrights in broadcast television programs against Aereo, Inc., whose service allowed subscribers to watch television programs over the internet at virtually the same time as the program was broadcast. *See WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 680–84 (2d Cir. 2013), *rev'd sub nom. American Broadcasting Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014). Once a subscriber chose a program, one of Aereo's servers selected a separate, dedicated antenna out of thousands it housed in a centralized warehouse, which then received the broadcast and transmitted it over the internet to the subscriber. *See id.* at 682–83. Applying *Cablevision*, we held that the plaintiffs were not likely to succeed on their claims that Aereo's transmissions were infringing under the Copyright Act, and therefore we affirmed the district court's denial of a preliminary injunction. *Id.* at 696.

The Supreme Court reversed on grounds unrelated to whether Aereo's conduct was volitional. *Aereo*, 573 U.S. at 432. The Supreme Court held Aereo liable for direct copyright infringement because Aereo's system resembled the community antenna television (CATV) systems that Congress amended the Copyright Act in 1976 to cover. *Id.* at 441, 450–51. Previously, the Court had rejected the argument that CATV companies performed copyrighted television material. *See id.* at 439. The 1976 Act made it clear that rebroadcasting companies

11

both performed the programs and, under a newly enacted provision, also transmitted the performance to the public. *See id.* at 441–42. The *Aereo* majority viewed the case as squarely within the genre of television retransmission, *see id.* at 441–49, which has nothing to do with internet service providers except as they may operate within that genre. The majority did not discuss the issue of volitional conduct.

In dissent, Justice Scalia, joined by Justices Thomas and Alito, applied a volitional conduct analysis, stating that "[t]he Networks' claim is governed by a simple but profoundly important rule: A defendant may be held directly liable only if it has engaged in volitional conduct that violates the [Copyright] Act." *Id.* at 453. In setting out the volitional conduct test, Justice Scalia noted that the volitional conduct requirement is "firmly grounded in the [Copyright] Act's text," *id.* at 453, that "[e]very Court of Appeals to have considered an automated-service provider's direct liability for copyright infringement has adopted that rule," *id.* (citing *Fox Broadcasting Co. v. Dish Network LLC*, 747 F.3d 1060, 1066–1068 (9th Cir. 2014); *Cablevision*, 536 F.3d at 130–131; *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549–550 (4th Cir. 2004)), and that although the Supreme Court has "not opined on the issue, our cases are fully consistent with a volitional-conduct requirement," *id.* at 454. Accordingly, whether or not one agrees with Justice Scalia's

12

conclusion that Aereo did not engage in volitional conduct, *id.* at 457, his unchallenged discussion of that standard is instructive.

BWP reads into the majority's silence on volitional conduct in *Aereo* a declaration that the volitional conduct requirement is dead. I disagree. First, it is plain that *Aereo*, as viewed by the majority, is confined to the discrete area of television rebroadcasting, which explains both the absence of the majority's discussion of volitional conduct and *Aereo*'s inapplicability to the case before us. Second, we have reaffirmed post-*Aereo* (albeit without discussing *Aereo*) that "[v]olitional conduct is an important element of direct liability." *MP3tunes*, 844 F.3d at 96 (holding that ISP that designed a system to infringe satisfied the volitional conduct requirement); *see also Great Minds*, 886 F.3d at 97; *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 181 (2d Cir. 2018). Because we have limited authority to overturn the decisions of prior panels even if we wanted to, the argument that the volitional conduct standard disappeared with *Aereo* is unavailing. *See Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 378 (2d Cir. 2016). *Aereo* did nothing to disturb *Cablevision*'s volitional conduct requirement and that requirement continues to apply to cases involving ISPs.[5]

---

[5] Alternatively, BWP argues that even if the volitional conduct requirement survived *Aereo*, it only applies to defendants that are not ISPs because ISPs are already protected by the DMCA. *See* Appellant Br. at 21–

13

With this background, I turn to the question of whether either party is entitled to summary judgment on direct infringement.

### B. Whether Polyvore Acted Volitionally

The district court granted summary judgment to Polyvore, dismissing BWP's direct infringement claim. Notwithstanding a dispute about whether Polyvore made additional unrequested copies of BWP's images, the district court found that Polyvore did not act volitionally by designing the Clipper or copying BWP's images because (1) the images appeared on Polyvore's site without affirmative acts by Polyvore employees and (2) there was no evidence that the Clipper was designed specifically to infringe. I agree with the district court that Polyvore did not act volitionally when it designed the Clipper and made one copy of user-uploaded images belonging to BWP, but I disagree about the materiality of the additional images. After reviewing the record *de novo*, *Baldwin*, 805 F.3d at 25, I conclude that BWP produced sufficient evidence of additional copying to raise a question of material fact about whether Polyvore, separate from its users, acted volitionally by making and displaying the additional copies of BWP's images.

An ISP acts volitionally when it creates a program designed to infringe copyrighted material and selects the copyrighted material

28. This is unpersuasive because, as previously discussed, we applied the volitional conduct requirement to an ISP in *MP3tunes*. *See* 844 F.3d at 96.

14

that it copies. *See MP3tunes*, 844 F.3d at 96.[6] In *MP3tunes*, for example, we upheld a jury verdict finding the defendant liable for direct infringement where the defendant had designed a program specifically to collect material that its creators knew to be copyrighted: album cover art. *See id.*; *see also Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 720 (S.D.N.Y. 2014) *aff'd in part, rev'd in part and remanded sub nom. EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016).

In contrast, the volitional conduct requirement is not satisfied when an ISP simply displays user-uploaded images and plays no role in selecting the images.[7] *See, e.g.*, *MP3tunes*, 844 F.3d at 96–97 (holding that displaying images only violated Copyright Act when defendant also took the additional step of procuring unrequested copyrighted images); *CoStar*, 373 F.3d at 551 (holding defendant ISP not liable for direct infringement for simply displaying user-posted real estate

---

[6] This principle is also articulated by Justice Scalia in his *Aereo* dissent: "The defendant may be held directly liable only if the defendant itself 'trespassed on the exclusive domain of the copyright owner.'" *Aereo*, 573 U.S. at 454 (quoting *CoStar*, 373 F.3d at 550). "Most of the time that issue will come down to who selects the copyrighted content: the defendant or its customers." *Id.* at 454–55 (citing *Cablevision*, 536 F.3d at 131–132).

[7] In questioning this statement, Judge Newman's concurrence cites to *Capital Records, LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018). That case, however, did not specifically discuss the volitional conduct requirement. And in any case, ReDigi's program seems more akin to the program in *MP3tunes*, in that it "inevitably involves the creation of new [copyrighted] phonorecords," *id.* at 657, through unauthorized reproduction, *id.* at 659.

photos because defendant's actions were "not truly 'copying' as understood by the [Coypright] Act" and defendant acted simply as a "conduit[] from or to would-be copiers"); *Netcom*, 907 F. Supp. at 1372 ("No purpose would be served by holding liable those who . . . might be in some sense helping to achieve . . . the users' 'public' display of files."); *see also Cablevision*, 536 F.3d at 132 (suggesting that an ISP's passive display of images "where all copied content was supplied by the customers themselves" would fall short of the requisite volitional conduct because it would be less proximate than even Cablevision's non-infringing conduct).

Likewise, an ISP does not act volitionally when it automatically makes a single copy of content selected by the user in response to a user's request. *See Cablevision*, 536 F.3d at 123, 132. For example, Cablevision was not liable for direct infringement where its program created one copy of the copyrighted programming each user requested. *See id.*; *accord Fox Broadcasting Co.*, 747 F.3d at 1067 (holding that the user, not the defendant satellite television service provider, made the infringing copy of plaintiff's TV programs even where the satellite company modified start- and end-times of the programs and imposed certain restrictions on what users could record, because "Dish's program create[d] the copy only in response to the user's command").

ISPs that provide additional unrequested copies of copyrighted material in response to a user's request for a single copy, however, may be liable for direct infringement. *See MP3tunes*, 844 F.3d at 96. For example, we upheld MP3tunes's liability for direct infringement when it acted independently to copy and display copyrighted cover art that the user had not asked for each time the user uploaded a song. *See id*. We explained that the fact that MP3tunes's system "retrieved a copyrighted item that a user did not request, frequently without the user's knowledge" was sufficient evidence "that copying of the cover art was directed by MP3tunes, not users." *MP3tunes*, 844 F.3d at 96; *accord Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160–61 (9th Cir. 2007) (holding that copyright holders who challenged Google's creation of a thumbnail version of their copyrighted images, which the user had not specifically requested be made, had made out a prima facie case of direct copyright infringement).

In this case, there is no evidence that Polyvore designed the Clipper to retrieve exclusively a specific kind of image that Polyvore knew to be copyrighted. Instead, the evidence shows that Polyvore designed a tool that its users could use to clip images generally, whether copyrighted or not. Thus the single act of designing the Clipper does not amount to volitional conduct that can be said to "cause[] the copy to be made" each time its users selected the image and used the Clipper to create a single copy of the image. *Cablevision*,

536 F.3d at 131. Accordingly, Polyvore cannot be liable for direct copyright infringement for designing the Clipper to simply retrieve photos picked out by users from other websites (before Polyvore makes any copies).

Likewise, the undisputed record in this case shows that one copy of user-uploaded images on Polyvore's website was displayed automatically by Polyvore's software. Like the defendant ISP in *CoStar*, Polyvore simply served as a "conduit[]" that allowed the user to display his clipped images. 373 F.3d at 551. This "conduit" function aligns Polyvore with the hypothetical ISP that only displayed user-supplied content that we discussed in *Cablevision*. 536 F.3d at 132. At the user's direction, Polyvore simply displayed the image its user directed it to display. As to that one copy, it is clear to me that the user, who selected the item to be copied, and not Polyvore, "cause[d] the copy to be made." *Cablevision*, 536 F.3d at 131. Thus, in accordance with *Cablevision*, Polyvore is not liable for displaying the images its users uploaded.

There is evidence in the record, however, that after a user clipped one of BWP's images, Polyvore made further copies that the user did not request. The spreadsheet prepared by BWP's counsel listing eighty-five different images that appeared on Polyvore's website shows that for at least some images that users uploaded to Polyvore, additional copies of the same images appeared in varying

sizes at distinct URLs.[8] Although this spreadsheet does not list images at issue in this case, it does provide circumstantial evidence from which a reasonable juror could infer that BWP's images, which appeared on Polyvore's website only two years earlier, were also copied in the same way. Drawing all inferences in favor of BWP, as we must, I conclude that BWP has met its burden of raising an issue of material fact as to whether Polyvore made additional unrequested copies of BWP's copyrighted images. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

This dispute is material because, assuming the jury finds that BWP's images were in fact copied multiple times, Polyvore's copying, like the copying in *MP3tunes*, was triggered regardless of whether the user knew about, let alone asked for, the additional images. *See* 844 F.3d at 96. This suggests that Polyvore, separate from its users, may have committed an infringing act. And, by stripping its resized images of their metadata and housing them at separate URLs where they were able to be viewed by anyone, Polyvore is alleged to have

---

[8] During the course of this appeal, Polyvore appears to have ceased to operate its website. *See* Matney, *supra* note 1. The links that BWP put into the record showing the additional copies, therefore, no longer actively link to copies of the images. Because we were able to view some of these images at the listed URLs before the images were removed and because Polyvore's counsel confirmed at oral argument that the Clipper makes more than one copy, I conclude that this evidence is sufficient at this stage to establish some additional copying. *See Barlow v. Male Geneva Police Officer who Arrested me on Jan. 2005*, 434 F. App'x 22, 24 n.1 (2d Cir. 2011).

gone further than the defendant in *Perfect 10*, who only made temporary thumbnail versions of the relevant images. 508 F.3d at 1160-61. I do not think it is dispositive, as Polyvore suggests, that Polyvore did not *retrieve* copyrighted information like the defendant did in *MP3tunes*. *See* 844 F.3d at 96. After all, the Copyright Act is violated not when data is procured before the copies are made, but when the copies are made. Accordingly, I conclude that the district court erred in granting summary judgment to Polyvore based on the absence of volitional conduct regarding the unrequested copies, and that, as to those copies, the case must be remanded. *See, e.g.*, *Anderson*, 477 U.S. at 248.

## C. Judge Newman's Concurring Opinion

In his concurring opinion, Judge Newman argues that the volitional conduct requirement should be understood as a causation requirement. I disagree with this approach for several reasons.

First, it seems to me that volition and causation are different concepts. Importantly, what Judge Newman refers to when he discusses causation is not "but for" causation, but rather "proximate" causation. Proximate causation is a negligence concept that has to do with risk and foreseeability. *See* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 29 (2010) ("An actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious."). Volition, on the other hand, is "[t]he act of making a choice

or determining something." VOLITION, Black's Law Dictionary (10th ed. 2014). In the context of direct copyright infringement, volition "is *choosing* to engage in an act that causes infringement." 3 PATRY ON COPYRIGHT § 9:5.50 (emphasis added). Therefore, although a volition analysis may under certain circumstances require an explicit causation analysis, and although applying only a causation analysis to particular facts may yield the same result as a volition analysis, , volition is not the same thing as causation. When the district court in *Netcom* referred to "volition or causation" in stating how direct liability might be limited "where a defendant's system is merely used to create a copy by a third party," 907 F. Supp. at 1370, I think it was positing two possibilities, not one. In any event, subsequent opinions in our circuit have clearly applied a volition requirement, not a causation requirement. *Fox News Network, LLC*, 883 F.3d at 181; *MP3tunes*, 844 F.3d at 96; *Cablevision*, 536 F.3d at 131. Absent a ruling from the Supreme Court endorsing a causation requirement, the only way to introduce such a requirement into our jurisprudence (either in addition to or in lieu of the volition requirement) would be through our *en banc* process. *Doscher*, 832 F.3d at 378.

I also have serious reservations about applying a proximate causation analysis to the question of direct infringement. First, volition has textual underpinnings in the Copyright Act, whereas proximate causation does not. *See Aereo*, 573 U.S. at 453 (Scalia, *J.*,

dissenting). Second, because proximate causation is a concept that sounds in negligence and deals with the foreseeability of risks, it seems out of place to apply it to a strict liability tort like direct infringement. Third, proximate causation has an opacity and imprecision that has generated significant confusion. *See* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 29 cmt. b (2010) ("[T]he term 'proximate cause' is a poor one to describe limits on the scope of liability. It is also an unfortunate term to employ for factual cause or the combination of factual cause and scope of liability. Even if lawyers and judges understand the term, it is confusing for a jury."). Fourth, when proximate causation is employed, more often than not, it is to determine who should *not* be held liable for committing a particular tort, rather than the converse. *See id.* at § 29 cmts. d–e. For this reason, tort cognoscenti have urged that the term be abolished. *See e.g.* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM 6 Spec. Note (2010). It is noteworthy that the pertinent section of the Third Restatement of Torts in dealing with this area of law uses the caption "Scope of Liability (Proximate Cause)" and comments that when the Fourth Restatement is published, the authors "fervently" hope that the parenthetical will be removed all together. *Id.* Fifth, Judge Newman further opines that proximate causation in the context of determining who infringes is different from proximate causation in determining who or what is responsible for the harm,

and that here we are concerned only with the former. But if the term has two possible independent applications in the law, why sow even more confusion by using the term in the copyright context when the word volition will do? It therefore strikes me as ill-advised to import the confusing baggage of proximate causation into the discrete and specialized tort of copyright infringement where negligence is rarely (if at all) at issue.

Finally, it is important to remember that direct liability is not the only avenue for recovery against an ISP for copyright infringement. Secondary liability exists precisely to impose liability on defendants who, while not directly responsible for infringing conduct, still should be held liable. Direct liability "applies when an actor personally engages in infringing conduct." *Aereo*, 573 U.S. at 452 (Scalia, *J.*, dissenting). "Secondary liability, by contrast, is a means of holding defendants responsible for infringement by third parties, even when the defendants have not themselves engaged in the infringing activity. It applies when a defendant intentionally induces or encourages infringing acts by others or profits from such acts while declining to exercise a right to stop or limit them." *Id.* (citations, internal quotation marks, and modifications omitted). I think secondary liability is the proper framework for holding an ISP liable for copyright infringement when the ISP does not select the copyrighted material and make the infringing copy itself but is aware

of it and encourages or contributes to the infringement by the direct volitional infringer.

One might conclude from reading Judge Newman's concurring opinion that the only kind of copyright liability is direct liability. But the concerns that motivate his desire to hold ISPs liable for infringing conduct under direct liability are addressed by the existence of secondary liability. And the existence of these two types of liability supports the volitional conduct requirement. As Justice Scalia stated in his *Aereo* dissent, "[t]he distinction between direct and secondary liability would collapse if there were not a clear rule for determining whether *the defendant* committed the infringing act. The volitional-conduct requirement supplies that rule; its purpose is not to excuse defendants from accountability, but to channel the claims against them into the correct analytical track." *Aereo*, 573 U.S. at 455.

It is true that secondary liability is no longer at issue in this case because BWP has abandoned that claim. But BWP's abandonment of its secondary liability claim is no reason to try to shoe-horn what should be that claim into a direct liability claim or to confuse the concept of volition in determining direct liability by equating it to proximate causation.

## II. DMCA Safe Harbor

Polyvore next argues that even if a jury could find that it directly infringed BWP's exclusive rights to display and reproduce its

24

copyrighted images, Polyvore cannot be held liable for direct infringement because it qualifies for the safe harbor of § 512(c) found in Title II of the DMCA.

Congress passed Title II of the DMCA in 1998 to "clarify the liability faced by service providers who transmit potentially infringing material over their networks." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012) (internal alteration and quotation marks omitted) (quoting S. Rep. No. 105–190 at 2 (1998)). The act established four safe harbors to spare ISPs from liability for "claims of copyright infringement based on (a) 'transitory digital network communications,' (b) 'system caching,' (c) 'information residing on systems or networks at [the] direction of users,' and (d) 'information location tools.'" *Viacom*, 676 F.3d at 27 (quoting 17 U.S.C. § 512(a)-(d)).

The section at issue here, 512(c), provides:

> A service provider shall not be liable . . . for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—
> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing; (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the

25

material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1). A service provider that meets all of these criteria is shielded from copyright liability as long as it also "has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and . . . accommodates and does not interfere with standard technical measures." 17 U.S.C. § 512(i)(1). Since the DMCA safe harbors are affirmative defenses, a defendant generally has the initial burden of establishing that it meets the statutory requirements. *See Capitol Records, LLC v. Vimeo*, LLC, 826 F.3d 78, 94 (2d Cir. 2016).

Polyvore argues it has satisfied all of these requirements for the DMCA safe harbor of § 512(c) because the undisputed record shows that at the time of the conduct alleged: (1) Polyvore was an ISP, (2) Polyvore registered an agent to receive take-down notices and remove infringing content, (3) Polyvore had a repeat infringer policy, (4) the infringing images were initially uploaded by users, and (5) Polyvore had no actual or "red flag knowledge" that any of BWP's images uploaded by users were copyrighted.

In response, BWP argues that Polyvore is not eligible for any safe harbor under the DMCA because (1) by altering the metadata of

images uploaded to its site it interfered with "standard technical measures" in contravention of § 512(i), and (2) the copying of the additional images was not infringement "at the direction of the user." Appellant's Br. at 41. I agree with Polyvore that BWP has not raised an issue of material fact as to whether preserving metadata is a "standard technical measure," but other questions of material fact still prevent me from saying that Polyvore has shown that the copying here was done "at the direction of the user."

## A. Metadata as a standard technical measure

Because the district court held that Polyvore's conduct was not infringing, it did not address whether Polyvore's stripping of metadata interfered impermissibly with "standard technical measures" such that Polyvore was not eligible for the DMCA safe harbor. 17 U.S.C. § 512(i). Because the proper interpretation of the statutory phrase "standard technical measures" is a question of law, I address it even though the district court did not. *See Travelers Ins. Co. v. Pataki*, 63 F.3d 89, 93 (2d Cir. 1995).

The DMCA defines "standard technical measures" as "technical measures that are used by copyright owners to identify or protect copyrighted works." 17 U.S.C. § 512(i)(2). To qualify as a standard technical measure, a practice must (1) "have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards

process," (2) be "available to any person on reasonable and nondiscriminatory terms," and (3) "not impose substantial costs on service providers or substantial burdens on their systems or networks." 17 U.S.C. § 512(i)(2). When a measure meets these qualifications, "[r]efusing to accommodate or implement a 'standard technical measure' exposes a service provider to liability." *Viacom*, 676 F.3d at 41. In other words, section 512(i) encourages copyright owners and ISPs to work together to establish technical means by which service providers can cheaply and easily identify infringing material. *See Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 615 (9th Cir. 2018) ("One can imagine a digital version of the old c in a circle (©) automatically triggering the uploading software to exclude material so marked by the copyright owner."). At issue here is whether metadata such as that used in the images in this case has become a "*standard* technical measure." 17 U.S.C. § 512(i) (emphasis added).

The caselaw provides little guidance on how to know when a widely followed practice has evolved into a "standard technical measure." *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1115 (9th Cir. 2007) (remanding to the district court to determine whether blocking copyright holders' access to a website is a "standard technical measure," and if so whether defendant interfered with that access); *Gardner v. CafePress Inc.*, 2014 WL 794216, at *6 (S.D. Cal. Feb. 26, 2014) (finding dispute of material fact as to whether stripping

metadata regarding images' copyright information is a "standard technical measure"); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 745 (S.D.N.Y. 2012) (holding that providing editing tools that some users used to remove watermarks from images did not interfere with "standard technical measures"), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014); *Obodai v. Demand Media, Inc.*, 2012 WL 2189740, at *5 (S.D.N.Y. June 13, 2012) (holding that distributing copyrighted texts and entering into a distribution agreement was "not evidence of interference with standard technical measures under the DMCA"), *aff'd sub nom. Obodai v. Cracked Entm't Inc.*, 522 F. App'x 41 (2d Cir. 2013).

I need not expound upon what may or may not constitute a "standard technical measure" because BWP has not come close to establishing that there is a broad consensus among copyright owners and service providers that preserving metadata should be so considered.[9] BWP's primary "evidence" is a single document attached as an exhibit to its opposition to summary judgment entitled "Guidelines for Handling Image Metadata," authored by the

---

[9] Although Polyvore has the burden of proving its affirmative defense of its entitlement to the safe harbor of § 512(c), *see Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039 (9th Cir. 2013), BWP, as the party asserting that metadata is a standard technical measure, has the burden of proving it. *See Nat'l Commc'ns Ass'n, Inc. v. AT & T Corp.*, 238 F.3d 124, 131 (2d Cir. 2001) ("The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim.") (internal quotation marks omitted).

Metadata Working Group, which is made up of representatives from Adobe, Apple, Canon, Microsoft, Nokia, and Sony. Dkt. 85-2 at 2. This document is wholly deficient in establishing that preserving metadata is "standard." First, representatives from these six software and hardware companies do not constitute a *broad* consensus" of "copyright owners and service providers." 17 U.S.C. § 512(i)(2)(A) (emphasis added); *see also* 17 U.S.C. § 512(k).[10] Even assuming that these companies are all "service providers" within the meaning of the statute, there is no demonstrated consensus of copyright owners. Moreover, the language in the document itself hardly permits the inference that preserving metadata is an industry "standard." Instead, the document does no more than indicate that, at the time of

---

[10] Additionally, at least some of these companies, on BWP's telling, appear not to meet the statutory definition of a "service provider." 17 U.S.C. § 512(k)(1) ("[T]he term 'service provider' means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received."). According to BWP, Canon develops printers, projectors, and lenses; Adobe makes multimedia software and products for creating webpages; Apple produces consumer technology and software; Nokia manufactures cellular phone technology; Microsoft makes software and consumer electronics; and Sony manufactures electronics and is involved in music publishing and financial services. Even if some of these companies do function as ISPs, BWP has not put forth evidence definitively showing that all of these companies "offer[] the transmission, routing, or providing of connections for digital online communications," 17 U.S.C. § 512(k)(1), sufficient to show that the views of these companies alone indicates a "consensus" of "service providers." 17 U.S.C. § 512(i)(2)(A).

30

its authorship in 2010, preserving metadata was an aspirational goal. *See* App'x at 211 (listing "goals" of working group as including the "[p]reservation and seamless interoperability of digital image metadata"). Furthermore, the document does not categorically reject deleting metadata; in fact, it sets out norms for when and how metadata may be deleted. App'x at 271 (stating that deleting metadata can be a "legitimate design choice"); App'x at 271 ("[Applications that modify metadata] need to *strive to* preserve information while ensuring that changes leave the metadata relevant and consistent" (emphasis added)). Most importantly, rather than claiming that there is an existing norm around preserving copyright metadata, the document states that whether to place "additional safeguards . . . around sensitive metadata such as copyright" is "the purview of the application," not the working group. App'x at 271.[11]

Alternatively, BWP argues that because courts interpreting 17 U.S.C. §§ 1202–1204, which establish civil and criminal penalties for

---

[11] BWP also points to evidence that the International Press Telecommunications Counsel, a consortium of news-industry groups, has established norms around photo metadata. *See* Sanders Decl. ¶ 49–56, ECF 85. These norms, however, refer to how metadata can be *added* to images, and therefore hardly establish that there is a norm about whether metadata can be removed. *See, e.g.*, *The IPTC Photo Metadata Standard*, THE INTERNATIONAL PRESS TELECOMMUNICATIONS COUNSEL, https://iptc.org/standards/photo-metadata/iptc-standard/ (last visited April 16, 2019) ("[The IPTC Photo and Metadata Standard] defines metadata properties that allow users to *add* precise and reliable data about images." (emphasis added)).

removing "copyright management information," have considered metadata to be copyright management information, metadata should be considered a standard technical measure. This argument is unavailing. The section of the DMCA that specifies when a "technical measure" can be considered "standard" makes no reference to "copyright management information," § 1202, or to judicial interpretations of § 1202. *See* 17 U.S.C. § 512(i)(2). The fact that some courts have construed § 1202's prohibition on destroying "copyright management information" to reach metadata is beside the point and, regardless, does not speak to the standardization question. "When a statute includes an explicit definition, we must follow that definition," *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000); *see also Burgess v. United States*, 553 U.S. 124, 129 (2008), and there is no indication in § 512(i) that Congress intended that items that courts find to be "copyright management information" for § 1202 purposes somehow count as "standard technical measures" for § 512(i) purposes. *See Burgess*, 553 U.S. 124, 130 (2008).

More broadly, Congress did not leave it to the courts to simply pronounce out of thin air that a given technical measure has become a "standard" in the industry such that interfering with it prevents an ISP from claiming the protection of the § 512(c) safe harbors. It is plain from § 512(i) itself that such a pronouncement can only come from "a broad consensus of copyright owners and service providers in an

32

open, fair, voluntary, multi-industry standards process." 17 U.S.C. § 512(i)(2)(A). I see nothing to show, to date, that such a consensus or such a process has developed. For these reasons, BWP has failed to proffer evidence upon which a reasonable jury could conclude that altering or destroying metadata disqualifies a service provider from the safe harbor protections of § 512(c).

## B. Storage "at the direction of a user"

"The § 512(c) safe harbor is only available when the infringement occurs 'by reason of the storage *at the direction of a user* of material that resides on a system or network controlled or operated by or for the service provider.'" *Viacom*, 676 F.3d at 38 (emphasis added) (quoting 17 U.S.C. § 512(c)(1)).

BWP argues in passing that Polyvore is ineligible for the § 512(c) safe harbor protections because Polyvore, not its users, made the infringing additional copies, thereby disqualifying Polyvore from the safe harbor for copying done "at the direction of a user." 17 U.S.C. § 512(c). The question whether the storage of the materials by Polyvore was "at the direction of the user" turns upon whether additional copies that are not specifically requested by the user are still made at the direction of the user when that user's request for a single copy triggers their automatic production.

Making copies of user-uploaded materials solely to facilitate user access does not disqualify an ISP from availing itself of the

§ 512(c) safe harbor. For example, in *Viacom*, we held that YouTube had met the requirements of the § 512(c) safe harbor even though it had converted or "transcoded" videos its users uploaded into a standard display format. 676 F.3d at 38–39. That transcoding process involved automatically "mak[ing] one or more exact copies of the video in its original file format," as well as one or more copies in "Flash" format once a user uploaded a video. *Id.* at 28. These copies allowed YouTube to make user-uploaded videos accessible not just to the user who uploaded the video, but to other users who requested to play the video. *See id.* at 28, 39. Relying on Ninth Circuit precedent, we rejected plaintiffs' argument that the transcoding was not "by reason of" user storage, because the transcoding merely served to "render the video viewable over the Internet to most users" and delivered copies of YouTube videos to the user "in response to [the] user['s] request." *Viacom*, 676 F.3d at 39 (internal quotation marks omitted). Thus, even though YouTube made additional copies, potentially unbeknownst to the user, it still qualified for the § 512(c) safe harbor. *See id.*; *see also Ventura Content*, 885 F.3d at 605–06 ("[T]he phrase by reason of the storage at the direction of a user covers more than 'mere electronic storage lockers. It allows service providers to perform access-facilitating processes.") (internal quotation marks omitted); *UMG Recordings, Inc. v. Shelter Capital Partner, LLC*, 718 F.3d 1006, 1012, 1016, 1019–20 (9th Cir. 2013) (holding that defendant's use

of "access-facilitating processes that automatically occur when a user upload[ed] a video," including making four copies of video in various formats so that they could be viewed on multiple devices, did not disqualify it from "by reason of storage at the direction of the user" safe harbor).

There is a question of material fact as to whether Polyvore's additional copies were made solely to facilitate access by users. Polyvore, as the party with the burden to prove its affirmative defense, *see Columbia Pictures*, 710 F.3d at 1039, has not pointed to evidence in the record that shows, assuming these copies were made, why they were made at all.[12] Without facts in the record about the purpose and function of these additional copies, I am unable to determine whether the copies here were made to "render" user-uploaded content "viewable over the Internet to most users." *Viacom*, 676 F.3d at 39.

On the current incomplete record, Polyvore appears to resemble the defendants in *Viacom* and *UMG* in some ways, but not in others. For example, like the defendants in *Viacom* and *UMG*, Polyvore is alleged to have made, unbeknownst to its users, multiple copies of user-uploaded images. *See Viacom*, 676 F.3d at 39; *UMG*

---

[12] At oral argument, Polyvore's counsel said that the copies were made to make the images visible on a range of devices, a practice some amici tell us is common. *See* Br. of Amici Curiae Electronic Frontier Foundation, Center for Democracy and Technology, and Public Knowledge at 13–14.

*Recordings, Inc.*, 718 F.3d at 1019–20. And Polyvore, like the defendants in those cases, is alleged to have slightly altered the user-uploaded content when it resized the uploaded images. *See Viacom*, 676 F.3d at 28 (finding that defendant converted uploaded videos into other file formats); *UMG*, 718 F.3d at 1012 (finding that defendant broke down uploaded videos into smaller "chunks"). Unlike in *Viacom* and *UMG*, however, the copies at issue here were allegedly given separate URLs that could be viewed by anyone at any time. *See UMG*, 718 F.3d at 1019 (discussing how risk of infringement is lessened when copies are inaccessible to public). Because Polyvore's similarity to the defendant in *Viacom* centers on the existence and nature of the disputed additional URLs, however, I cannot decide as a matter of law whether Polyvore's copying occurred "at the direction of [the] user." 17 U.S.C. § 512(c)(1). Therefore, a remand to the district court to apply *Viacom* after further factfinding is required. In doing so, the district court may want to consider, among other things, whether under *Viacom* a defendant's alteration, if any, of the original image matters or whether it is significant that user-uploaded content is housed at separate, publicly accessible URLs.

### III. Attorney's Fees

Polyvore's sole argument in its cross-appeal is that because of BWP's history of aggressively filing cases that it fails to prosecute, the district court abused its discretion by declining to award Polyvore

fees under 17 U.S.C. § 505. In reaching its decision, the district court appropriately considered BWP's general "diligen[ce]," discovery conduct, and the Copyright Act's goals to conclude that, viewed in the totality of the circumstances, sanctions were not warranted because BWP had not acted in "bad faith" or engaged in "misconduct before the court." App'x at 533; *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1985 (2016). Mindful that the district court was "intimately familiar with the nuances of the case" and "in a far better position" to assess the severity of BWP's actions than we are, *In re Bolar Pharm. Co., Sec. Litig.*, 966 F.2d 731, 732 (2d Cir. 1992), I cannot say that the district court, in concluding that BWP's conduct did not merit sanctions, strayed outside the range of permissible decisions. *See In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 134 (2d Cir. 2014).

However, notwithstanding the district court's denial of legal fees, I cannot let pass my concern over BWP's record of aggressive litigation, which entails filing hundreds of lawsuits directed at ISPs without even attempting to substantiate its claims in discovery. *See BWP Media USA Inc. v. Rich Kids Clothing Co.*, LLC, 103 F. Supp. 3d 1242, 1247–48 (W.D. Wash. 2015) (awarding fees to "deter BWP from engaging in similar litigation tactics in the future" after BWP "failed to comply with its pretrial disclosure and discovery obligations" and "waited until the deadline" to produce evidence supporting its

claims). Here, the fact that BWP filed a lawsuit before simply asking Polyvore to take its images down suggests that BWP has a business model that involves abusing the federal courts. *See id.* Despite my distaste for BWP's tactics, I cannot affirm the district court's dismissal of BWP's claims on summary judgment based on this record because questions of material fact remain. I therefore leave it to the district court to direct further discovery necessary to complete the necessary factfinding. To the extent the district court determines that this added effort could have been avoided had BWP taken discovery, the district court is of course aware of its discretionary authority to impose appropriate sanctions.

Jon O. Newman, Circuit Judge, concurring in the result.

The ultimate issue on this appeal, of increasing importance in the age of digital transmissions, concerns the circumstances under which a developer or operator of a computer system or program, activated by its customers, can be liable for direct infringement of a copyright. Now that the District Court, pursuant to our interim remand,[1] has ruled that the claims of secondary liability for infringement in this case have been abandoned,[2] the issue of liability for direct

---

[1] On October 11, 2018, we remanded the case to the District Court to "advise whether the [C]ourt understood that it had discretion . . . to determine whether the plaintiff had abandoned its secondary infringement claims, and, if not, whether it believed that it was required to reach the merits of those claims." *BWP Media USA Inc. v. Polyvore, Inc.* No. 16-2825 (2d Cir. Oct. 11, 2018) (order remanding for clarification).

[2] On December 13, 2018, the District Court responded to our remand by entering a Memorandum with three conclusions. *See BWP Media USA Inc. v. Polyvore, Inc.*, No. 13-cv-7867 (S.D.N.Y December 13, 2018) (Memorandum entered on remand ("Dist. Ct. Mem.")).

First, the District Court stated, "This Court thus did not believe that it had discretion to determine that Plaintiffs had abandoned their secondary infringement claims, but rather believed that it was required to reach the merits of those claims." Dist. Ct. Mem. at 2. The Court said it had reached that conclusion based on this Court's decision in *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004), which had ruled that a failure to make *any* response to a motion for summary judgment did not relieve a district court of the obligation to make sure that summary judgment for the movant was warranted. *See id.* at 246. We subsequently pointed out in *Jackson v. Federal Express*, 766 F.3d 189 (2d Cir. 2014), however, that "*Vermont Teddy Bear* involved a *pro se* litigant, and we are less demanding of such litigants generally, particularly where motions for summary judgment are concerned." *Id.* at 195. Especially pertinent to the then-pending appeal in this case, *Jackson* noted that "there is a relevant distinction to be drawn between fully unopposed and partially opposed motions for summary judgment in counseled cases," *id.* at 196, and ruled that "in the case of a counseled party, a court *may*, when appropriate, infer from a party's partial opposition [to a motion for summary judgment] that relevant claims or defenses that are not defended have been abandoned." *Id.* at 198 (emphasis added).

Second, the District Court stated, "Having reviewed *Jackson v. Federal Express* in light of the Second Circuit's remand, the Court concludes that its language counsels in favor of a finding of abandonment here," Dist. Ct. Mem. at 2, and set forth numerous facts and circumstances to support that finding. No member of the panel in the pending appeal believes that that finding of abandonment of claims of secondary infringement is clearly erroneous.

1

infringement, and only that issue, is before us. For that reason I express no views on the possibility that defendant Polyvore, Inc. might have been found secondarily liable for infringement.

However, as Judge Walker's opinion points out, before the direct infringement claim can properly be resolved, a remand is needed for District Court factfinding on two issues: first, whether, from the fact that Polyvore made multiple copies of 85 images for which plaintiff BWP Media USA Inc. ("BWP") holds a copyright, it is inferable that Polyvore also made multiple copies of the nine copyrighted images at issue in this case; second, whether additional copies of the copyrighted images were made solely to facilitate access by users so as to accord Polyvore the safe harbor protection of the Digital Millennium Copyright Act, 17 U.S.C. § 512(c)(1). I agree that a remand for factfinding is warranted and therefore concur in the judgment, but I write separately because, although I agree with much of Judge Walker's opinion, I disagree with some significant statements that Judge Walker has made concerning the so-called volitional conduct requirement for

Third and finally, the District Court concluded "that it would have been proper to infer that Plaintiffs had abandoned their secondary infringement claims." Dist. Ct. Mem at 3. This conclusion, read in conjunction with the District Court's second conclusion, is fairly understood to mean that had the District Court originally applied its current and correct understanding of *Jackson*, it would then have made the finding of abandonment that it has now made.

Thus, the abandonment of contributory infringement results from an explicit decision of the District Court, after the issue was specifically called to its attention. This is not a case where a claim of contributory infringement is alleged to have been abandoned because of some technical defect of pleading.

2

liability for direct infringement. Without concluding, in advance of the findings on remand, whether volitional conduct by Polyvore has been shown, I set forth some views on the volitional conduct requirement and on certain aspects of Judge Walker's opinion for such value as they might have for courts considering similar issues in the future and perhaps for the parties in this case considering the possibility of settlement.

I. Evolution of the volition requirement

Because the District Court rejected BWP's claim of direct infringement on the ground that Polyvore had not acted with the "volition" required for direct copyright infringement liability, *see BWP Media USA Inc v. Polyvore, Inc.*, No. 13-CV-7867(RA), 2016 WL 3926450, at \*1, \*6 (S.D.N.Y. July 15, 2016), I begin my analysis with an exploration of that concept, which recurs frequently in copyright jurisprudence, *see*, *e.g.*, *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130-32 (2d Cir. 2008), but is rarely explained.

The first articulation of ~~a~~ volitional conduct as a requirement for direct infringement of copyright occurred in *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) (usually cited as "*Netcom*"). At that time, no provision of the Copyright Act immunized an

3

alleged infringer for violating any of the proprietor's rights by means of a defendant's automatic processes activated by an individual. Nevertheless, Judge Whyte stated, "Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Id*. at 1370.

Preliminarily, I note that it is unlikely that Judge Whyte used the word "element" to mean a legally required element of an infringement claim. Numerous cases have long established that an infringement claim has only two elements – "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Television Service Co.*, 499 U.S. 340, 361 (1991). Thus, when an opinion of our Court later said that volition was "an important *element* of direct liability," *see Cartoon Network,*[3] 536 F.3d at 131 (emphasis added), it likely was not using the word in the sense of a third legal component of a cause of action (as Judge Walker today confirms), but rather more colloquially as a fact needed to be established whenever the identity of a person liable for direct infringement was in dispute. Why volition must sometimes be

---

[3] I do not know why this case is sometimes cited as "*Cablevision*," the name of the defendant, instead of "*Cartoon Network*," the name of the plaintiff. S*ee*, *e.g.*, Judge Walker's opinion in this case; *Fox News Network, LLC, v. TVEyes, Inc.*, 883 F.3d 169, 181 (2d Cir. 2018). *But see*, *e.g.*, *EMI Christian Music Group, Inc. v. MP3tunes*, 840 F.3d 69, 96 (2d Cir. 2016) (citing *Cartoon Network* as *"Cartoon Network"*).

4

shown emerges from consideration of Judge Whyte's phrase "volition or causation."

An initial issue posed by *Netcom*'s "volition or causation" phrase is whether the words "volition" and "causation" are synonyms or alternatives. Long before *Netcom*, there was no doubt that when the identity of a person liable for direct infringement was disputed, it was necessary to prove who caused the infringement. Infringement is a tort, as this Court long ago recognized, *see American Code Co. v. Bensigner*, 282 F. 829, 834 (2d Cir. 1923); *Ted Browne Music Co. v. Fowler*, 290 F. 751, 754 (2d Cir. 1923), and no person may be held liable for any tort unless that person (alone or with others) has caused the injury for which a claim is made. "Volition" in Judge Whyte's phrase is best understood to mean a concept essentially reflecting tort law causation. *See* 4 NIMMER ON COPYRIGHT (hereafter "NIMMER") § 13.08[C][1], at 13-290.6 ("*Netcom* simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts.") (internal footnote omitted).[4] Moreover, there is no reason to give "volition" a meaning separate from

---

[4] Having viewed the volition requirement of *Netcom* as a requirement of proximate causation, the NIMMER treatise later makes the somewhat surprising suggestion that it is preferable to treat volition as an "affirmative defense" that "a defendant who wishes to avoid liability must specially inject . . . into the case." *Id*. at 13-290.9 (discussing *Cartoon Network*, 536 F.3d at 131). Perhaps all the treatise means is that in most infringement cases there is no dispute as to the identity of the actor who might be liable, but where

"causation." Although many decisions and some commentators have written extensively about what they call "volition," they are essentially explaining a requirement of "causation," and it would be helpful to name the concept for what it is. And, as the NIMMER treatise makes clear, "causation," in the context of copyright infringement, is tort law "proximate cause," rather than "but for" causation. *See id*.; Robert C. Denicola, *Volition and Copyright Infringement*, 37 Cardozo L. Rev. 1259, 1268 (2016). However, in this context. "[u]nlike 'legal' or 'proximate' cause, 'causation' is not invoked in *Netcom* to evaluate the connection between the tort and the plaintiff's harm, but instead to analyze the connection between the defendant's actions and the commission of the tort. Judge Whyte was concerned with whether the defendants 'caused' the infringement, not whether the infringement 'caused' the plaintiff's injury." *Id*. at 1269.[5]

Volition, that is, causation, is widely accepted as a requirement for direct infringement liability. "[E]very circuit to address this issue has adopted some version of *Netcom*'s reasoning and the volitional-conduct requirement." *BWP*

---

that issue is in dispute, as is happening more frequently in the digital age, it must receive attention. But, as with the identity of a person who proximately caused any tort, the plaintiff must prove who is the tortfeasor.

[5] *See, e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 742 (S.D.N.Y. 2012) ("Direct liability requires 'volitional conduct' that 'causes' the infringement."), *aff'd sub nom. Wolk v. Photobucket.com*, 569 F. App'x 51 (2d Cir. 2014).

*Media USA, Inc. v. T&S Software Associates, Inc.*, 852 F.3d 436, 440 (5th Cir. 2017).

"To prove direct infringement, a plaintiff must show that . . . [a defendant] engaged in volitional conduct." *Leonard v. Stemtech International Inc.*, 834 F.3d 376, 386-87 (3d Cir. 2016) (internal citations omitted). Many courts, including the Second Circuit, have clearly understood volition to mean causation. "*Netcom* and its progeny direct our attention to the volitional conduct that *causes* the copy to be made." *Cartoon Network*, 536 F.3d at 131 (emphasis added).[6] "[D]irect infringement requires the plaintiff to show *causation* (also referred to as 'volitional conduct') by the defendant." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (emphasis added) (internal citation omitted).[7] When the Fourth Circuit endorsed *Netcom* in a case raising the issue whether ownership of a machine used by others to make illegal copies sufficed to establish direct infringement, it said, "There must be actual infringing conduct with a nexus sufficiently close and *causal* to the illegal

---

[6] In light of this assertion, no in banc rehearing is needed to establish that the Second Circuit considers the requirement of volitional conduct to concern causation.

[7] Elaborating the point, The Ninth Circuit explicitly disagreed with the suggestion (expressed in Judge Walker's opinion) that the meaning of "volition" in the copyright context should be drawn from a dictionary definition:

> "We wish to emphasize that the word 'volition' in this context does not really mean an 'act of willing or choosing' or an 'act of deciding,' which is how the dictionary defines the term. *Volition*, *Webster's Third New International Dictionary* (1986). Rather, as used by the court in *Netcom*, it 'simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts.' 4 NIMMER § 13.08[C][1]."

*Perfect 10*, 847 F.3d at 666 (citations abbreviated).

copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (emphasis added).[8]

The Supreme Court's first intimation of any thoughts concerning causation as a fact relevant to an infringement claim in the digital age was *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).[9] Although the Court's opinion does not use the word "volition," it considered the issue whether the manufacturer of a home video tape recorder ("VTR" (called "Betamax")) capable of producing a copy of a copyrighted video program at the command of a user, was liable for contributory infringement. Instead of inquiring first whether the user of a VTR was liable for infringement by making a copy and, if so, whether the VTR manufacturer was liable as an additional direct infringer or as a contributory infringer, the Court began its analysis by considering the manufacturer's possible liability.

---

[8] Occasionally courts state volition as an alternative to causation, implying that they regard the terms as different concepts. *See, e.g., Spanki Enterprises, Inc. v. Telwizja Polska, S.A.*, 883 F.3d 904, 912 (D.C. Cir. 2018) ("Several courts have . . .requir[ed] copyright plaintiffs to establish some element of volition on the part of an alleged infringer *or* some close causal nexus between the alleged infringer's conduct and the violation of the plaintiff's rights.") (emphasis added).

[9] For a thorough and enlightening analysis of the *Sony* decision, *see* Peter S. Menell & David Nimmer, *Unwinding Sony*, 95 Cal. L. Rev. 941 (2007).

Looking to patent law, the Court enlisted the "staple article of commerce" doctrine, insulating from contributory infringement the seller of a "staple article or commodity of commerce *suitable for substantial noninfringing use*," *Sony*, 464 U.S. at 440 (quoting 35 U.S.C. § 271(c)) (emphasis added). Applying that doctrine, the Court then considered whether VTRs were suitable for such use by examining what users were doing with them. "Accordingly, the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses." *Id*. at 442.

This was not an entirely satisfactory standard because any copying equipment *capable* of copying copyrighted materials is also *capable* of copying public domain materials. But the holding of *Sony* (more important than the opinion's language, as is true of all decisions) is entirely defensible. There was evidence that many producers of copyrighted video programs favored time-shifting in order to expand their viewing audience. See *id*. at 424 ("Sony introduced considerable evidence describing television programs that could be copied without objection from any copyright holder, with special emphasis on sports,

religious, and educational programming."). Thus, the Betamax device was not just capable of recording public domain materials, it was in fact being used to a considerable extent to make copies of copyrighted materials to which many copyright proprietors had no objection.

The next significant development concerning volition/causation was the emergence of the bill that, in a modified form, became the Online Copyright Infringement Liability Limitation Act in 1998, Pub. L. 105-304, tit. II, § 202(a), 112 Stat. 2860 (Oct. 28, 1998), codified at 17 U.S.C. § 512. This Act is Title II of the Digital Millennium Copyright Act ("DMCA Title II"). Although the House Judiciary Report on that bill stated that it "codifies the result" of *Netcom*, *see* H. Rep. No. 105-551, pt. 1, at 11 (1998), DMCA Title II, as enacted, is a more elaborate and more carefully calibrated set of provisions that cannot be said to "codif[y]" the sweep of *Netcom*. *See* 3 NIMMER § 12B.06[B][2][b]. As the NIMMER treatise wisely counsels, *Netcom* "should be followed to the extent that Congress deliberately embodied it into the law, and not followed in the other instances for which Congress chose not to codify it." *Id*. § 12B.06[B][2][c][i] (footnotes omitted).

Pertinent to the law of this Circuit, the next development concerning volition/causation was the decision of this Court in *Cartoon Network*. The holding

was unexceptional. At issue was a proposed remote storage digital video recorder ("RS-DVR") system, permitting TV viewers "to record cable programming on central hard drives housed and maintained by Cablevision at a 'remote' location" and "then receive playback of those programs through their home television sets, using only a remote control and a standard cable box equipped with the RS-DVR software." *Cartoon Network*, 536 F.3d at 124. We ruled that the system operator was no more liable for direct infringement than the manufacturer of a set-top VTR. *See id*. at 131; *see also Sony*, 464 U.S. at 456 (manufacturer of set-top VTR not liable for contributory infringement).

I agree with that holding because, for me, *Cartoon Network*, like *Sony* before it, is ultimately about time-shifting, and it should not matter whether the viewer's recorded copy resides in a Betamax VTR device on top of a TV set or in the remote server of the Cablevision company. Although the opinion in *Cartoon Network* never mentions time-shifting, it described Cablevision's technology as "akin" to "traditional set-top digital video recorders," 536 F.3d at 123. What else besides time-shifting made the RS-DVR system "akin" to an ordinary set-top recorder?

However, there is language in *Cartoon Network* that I question: "In determining who actually 'makes' a copy, a significant difference exists between

making a request *to a human employee*, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct." *Id*. at 131 (emphasis added).  I agree there is a difference, but the stark alternatives posed by this sentence create the risk that it will be overread to mean that only a human being who operates a copying system, for example, in a copy shop,[10] can satisfy the volition/causation requirement and render the copy shop liable for infringement, and that the person or entity that designs ~~and~~ or operates a system that makes one or more copies when it "automatically obeys commands" cannot be liable for infringement.[11] I am satisfied, however, that *Cartoon Network* did not intend to preclude infringement liability for all developers or operators of systems that automatically make copies upon an individual's command. The *Cartoon*

---

[10] The holding of *Cartoon Network* was that a remote recording system was just as immune from liability as the manufacturer of a set-top recording device, *see* 536 F.3d at 131, and any language in *Cartoon Network* comparing the remote recording system to a copy shop was dicta.

[11] For examples of such overreading, *see*, *e.g.*, *Wolk*, 840 F. Supp. at 742 ("There is no dispute that any reproduction, display or transmission of the Plaintiff's images by or through the KODAK Gallery website is an automated process *with no human intervention* by any employee of the Kodak Defendants.") (emphasis added); *Disney Enterprises, Inc, v, Hotfile Corp.*, 798 F. Supp.2d 1303, 1309 (S.D. Fla. 2011) ("Finally, the plaintiffs contend that they have alleged a volitional act because they have alleged that *hotfile.com* makes additional copies once the copyrighted material is uploaded to the server. This argument too fails, for courts have repeatedly held that the automated conduct of software, *unaided by human intervention*, is not 'volitional.' ") (emphasis added).

As one commentator has pointed out, "It is the concerted steps and their consequences, not the accident of whether those steps were executed by humans or automatons, that is the pivot of liability." Paul Goldstein, 1 GOLDSTEIN ON COPYRIGHT § 7.0.2 (3d ed. Supp. 2013).

*Network* opinion explicitly identified and left open the question "whether one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy." *Id.* at 133.

The risk that our Court would insulate from liability many developers or operators of systems that automatically caused an infringement at another person's command came close to fruition in a challenge to a system that allowed subscribers, for a fee, to watch over-the-air TV programs. A District Court denied a preliminary injunction against the operator of the system in light of *Cartoon Network. See Broadcasting Cos. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012) ("*Aereo I*"). The risk increased when a divided panel of our Court affirmed *Aereo I*. *See WNET, Thirteen v. Aereo, Inc.* 712 F.3d 676 (2d Cir. 2013) (*Aereo II*").

The risk lessened, however, when the Supreme Court reversed *Aereo II*. *See American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014) ("*Aereo III*"). But the status of systems that automatically caused an infringement at a customer's command remained uncertain because the Supreme Court's majority opinion said nothing about volition or causation. Instead, Justice Breyer said that Aereo's system was functionally the equivalent of a community access television system

("CATV") and noted that in the Copyright Act of 1976 Congress had "ma[d]e clear that an entity that acts like a CATV system itself performs [the copyrighted works], even if when doing so, it simply enhances viewers' ability to receive broadcast television signals," *id*. at 442, and therefore infringes the performance right of the owners of the copyright in the performed material, *see id* at 451. In dissent, Justice Scalia started from the premise that "[a] defendant may be held directly liable only if it has engaged in volitional conduct that violates the Act," *id.* at 453, and concluded that the defendant's operation of the CATV system "is a volitional act," *id.* at 456, "but, as in the case of the copy shop, [the defendant's] "degree of involvement is not enough for direct liability." *Id.*

II. Volition as Causation

Once volitional conduct is understood as essentially concerning causation, the issue becomes how the concept of causation applies in the context of alleged direct infringement of copyright arising from use of a defendant's system or program that automatically makes copies of copyrighted images at a keystroke by a defendant's customer. Consideration of that issue begins with general principles of causation in tort law. "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if

he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." RESTATEMENT (SECOND) OF TORTS § 876(b) ("Restatement"). "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . permits the other to act . . . with his instrumentalities, knowing or having reason to know that the other is acting or will act tortiously." *Id*. § 877(c).

Pertinent to the possible infringement liability of the operator of a system that facilitates automatic copying, the legislative history of the 1976 Copyright Act recognized that "where the work was infringed by two or more tort feasors [*sic*], the bill would make them jointly and severally liable."[12] "There is no rule of copyright law that would preclude the imposition of direct liability on both parties [*i.e.*, the system operator and the user]." Denicola, *supra*, 37 Cardozo L. Rev. at 1273.[13]

However, tort law principles of causation do not necessarily apply in the copyright field exactly as they apply with respect to torts generally or joint

---

[12] S. Rep. No. 94-473 at 162 (1975).

[13] Denicola cites two examples: "*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000) (holding a composer, a music publisher, and a record company liable for infringement of plaintiff's musical work); *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110 (2d Cir. 1986) (holding a printer and a publisher liable for infringement of a literary work)." Denicola, *supra*, 37 Cardozo L. Rev. at 1273 n.116 (italics added).

tortfeasor liability in particular. In addition to assuring protection for the rights of copyright owners in order to promote creativity, copyright law, especially in the digital age, must avoid such an expansive regime of protection that developers of computer programs and system operators are unduly deterred from making socially useful contributions to widespread access to information.

The caselaw has not yet developed clear principles for determining when the developer or operator of a system, activated automatically by a user, is jointly liable with the user for direct infringement. The Fourth Circuit hinted at a generalized approach for making such a determination when it observed that the Copyright Act creates liability for "a person who causes *in some meaningful way* an infringement." *CoStar Group v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (emphasis added). Though in dissent in *Aereo III*, Justice Scalia also hinted at a similar generalized approach when he said that the system operator's "*degree of involvement* is not enough for direct liability." 573 U.S. at 456 (Scalia, J., dissenting) (emphasis added). In another attempt to approximate the line a system operator crosses to become jointly liable with a user for direct infringement, a district court in this Circuit considered whether the operator shifted "'from [a] passive provider[] of a space in which infringing activities

happened to occur to [an] active participant[] in the process of copyright infringement,'" *Capitol Records, LLC v. ReDigi, Inc.*, 934 F. Supp. 2d 640, 657 (S.D.N.Y. 2013) (quoting *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009) (alterations in original) (quoting *Playboy Enterprises, Inc. v. Hardenburch, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997))), *aff'd*, 910 F.3d 649 (2d Cir. 2018).

III. Judge Walker's Opinion

With these thoughts in mind, I now consider Judge Walker's opinion in the pending appeal. I fully agree with many portions of that opinion. Specifically, I agree that the requirement of volitional conduct must be shown when there is dispute as to which party or parties caused a direct infringement and that *Aereo III* did not abrogate the requirement of such conduct. I also agree that the copy shop example, which Judge Walker's opinion mentions, illustrates one situation where volitional/causation conduct is not present, at least as long as the copy shop merely permits its customers themselves to use copying machines on the shop's premises. But care must be taken not to generalize from that example. That a copy shop is not liable for direct infringement when its customer makes a copy on a shop's copying machine does not mean that all

developers and operators of programs and systems are equally immune from such liability just because the customer selects the item to be copied and accomplishes the copying at a keystroke without any intervention by an employee of the developer or operator.

I disagree with Judge Walker's opinion when it appears to indicate that all developers or operators of systems that make copies, at a customer's keystroke command, of copyrighted materials selected by the customer should be insulated from direct liability for infringement. Selection by the customer may well be relevant to determining whether system developers or operators share direct liability with a customer, but is not necessarily determinative.[14] In any event, there is no need to make any definitive ruling on the significance of selection at this stage of the pending litigation.

I agree with Judge Walker when he says that "[a]n ISP acts volitionally when it creates a program designed to infringe copyrighted material," but I reject the arguable implication of this language that an ISP acts volitionally *only* when it creates a program designed to infringe copyrighted material. Judge Walker's

---

[14] Justice Scalia's emphasis on selection of copyrighted material as a key indicator of the party engaging in volitional conduct, as well as his entire analysis of volitional conduct, was expressed in dissent in *Aereo III*, *see* 573 U.S. at 454, and did not establish the position of the Supreme Court.

opinion cites *EMI Christian Music Group, Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016), but *MP3tunes* (as it is generally cited) did not say that the defendant's program was designed to infringe copyrighted material.  It said that the jury could have found that the defendant's program "was designed to *facilitate* infringement," *id*. at 94 (emphasis added), an easier standard for an infringement claimant to meet than "designed to infringe."[15] Furthermore, the principal issue in *MP3tunes* was whether an ISP "adopted and reasonably implemented" a policy to terminate "repeat infringers" so as to qualify for a safe harbor protection of the DMCA, 15 U.S.C. § 512(i)(1)(A), that shields it from liability for infringing acts of its customers. *See MP3tunes*, 844 F.3d at 88-91. The panel deciding *MP3tunes* had no occasion to decide whether the defendant was liable for direct infringement and did not purport to do so. Indeed, a requirement that a developer of a program or an operator of a system or would be liable for directly infringing copying only if its system or program was designed to copy copyrighted material would make no sense because any program or system capable of copying copyrighted material

---

[15] The only other use of the word "designed" in *MP3tunes* is the following sentence: "MP3tunes's employees testified that the company's LockerSync system was designed to retrieve one aspect of a copyrighted work (the album art) whenever a user uploaded another aspect of a copyrighted work (the song)." 844 F.3d at 96.That observation was not offered as a requirement for infringement.

could also copy material in the public domain.[16] After all, *Sony* exonerated the Betamax manufacturer from liability only after determining that "a significant number" of uses of the device were noninfringing, not all uses. *Sony*, 464 U.S. at 442, 444.

I do not entirely agree with Judge Walker when he says, again citing *MP3tunes*, that "the volitional conduct requirement is not satisfied when an ISP simply displays user-uploaded images."[17] This statement is no doubt true in some circumstances but not necessarily true in all circumstances. For example, in *Capitol Record, LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018), where the customer of a developer of a system for reselling lawfully purchased digital music files "cause[d]" a file of purchased music to be transferred to the developer's remote server, *see id*. at 653, we held that the receipt and storage of the file on the developer's server involved the making of an infringing copy, in that case, a new phonorecord, *see id*. at 657, which rendered the developer liable for violating the reproduction rights of the holder of the copyright in the music. *See id*. at 659.

---

[16] Perhaps "designed to copy" copyrighted material is intended to mean "designed for the purpose of copying" such material or even "designed for the principal purpose of copying" such material.

[17] For support, Judge Walker again cites *Cartoon Network*, which, as discussed above, held only that a defendant maintaining a remote recording device, used for time-shifting, was as insulated from liability as the manufacturer of a set-top recording device.

Finally, I do not agree with Judge Walker's conclusion that "Polyvore cannot be liable for direct copyright infringement for designing the Clipper[18] to simply retrieve photos picked out by users from other websites (before Polyvore makes other copies)." In view of the remand for further factfinding, which our judgment orders, it is at least premature to rule at this point whether Polyvore can be liable for designing the Clipper, and such a ruling might be incorrect. It is arguable that Polyvore has given "substantial assistance," Restatement § 876(b), to its customers to make copies of copyrighted photographs and has permitted its customers to act with its "instrumentalities," *id*. § 877(c) knowing that they "will act tortiously," *id.* It is also possible that Polyvore could reasonably be found to know that its Clipper tool would be used to search for photos of celebrities appropriate for embellishment with the addition of such items as clothing, hair styling, and jewelry, and that a considerable number of such photos would be copyrighted. And, unlike the owner of a copy shop, Polyvore maintains a continuing relationship with its customers. I prefer to withhold any ruling as to direct infringement until the District Court responds to our remand, and only then

---

[18] The Clipper is a key component of Polyvore's system.

face the vexing issue of what factors should determine whether the developer of a program or the operator system is jointly liable with its customer for causing direct copyright infringement and whether Polyvore's system crosses the line.

With these reservations, I concur in the result.

Rosemary S. Pooler, Circuit Judge, concurring in the result.

I concur in the result but write separately to emphasize the context and consequences of this case. To this effect, the Electronic Frontier Foundation, as amicus curiae, urges that such a website design as Polyvore's a) automatically generates copies of images in different sizes to allow users to view the images on various devices, and b) is "routine" and "very common [among] Internet technologies." Amicus Br. at 13-14, Dkt. No. 87.

Regardless whether the volitional conduct requirement is properly understood as a causation requirement, as Judge Newman urges and Judge Walker disputes, the question will boil down to whether Polyvore is sufficiently tied to the act of copying for direct infringement liability to attach. Accordingly, I have strong line-drawing concerns with Judge Walker's framing of volitional conduct: "an ISP does not act volitionally when it automatically makes a single copy in response to a user's request," but "ISPs that provide additional unrequested copies . . . in response to a user's request for a single copy . . . may be liable." There is no basis to conclude that "additional unrequested copies" are of any significance when a machine is simply a passive agent. For instance, in *MP3tunes*, the system was designed to seek out the copyrighted material—album

cover art which matched the user's songs. *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 96 (2d Cir. 2016). The user had not requested, much less supplied, any of the copyrighted material. *See id*. at 96-97.

While I concur in the result of remanding to the district court for further factfinding, I cannot agree with conceptualizing volitional conduct in such a way that an ISP does not act volitionally when it automatically makes one, but not more than one, unrequested copy in response to a user's request for a copy. I believe this volitional-conduct analysis must enter the landscape of multiple devices, mindful of both our copy-shop past and the realities of functional website design in our present.